United States District Court
Middle District of Florida
Jacksonville Division

**EARL M. JOHNSON, JR.,**

    *Plaintiff,*

v.                                            **NO. 3:21-cv-726-MMH-PDB**

**LENNY CURRY & RONALD DESANTIS,**

    *Defendants.*

## Order

Earl Johnson, Jr., proceeding pro se, sues Mayor Lenny Curry and Governor Ronald DeSantis under 42 U.S.C. § 1981 and § 1983, alleging their "enactment of general budgetary allocations" supporting Confederate monuments or "tributes" violates Mr. Johnson's rights under the Thirteenth and Fourteenth Amendments. D1.

The City of Jacksonville, on behalf of Mayor Curry, and Governor DeSantis move to dismiss the action. D16, D19. They contend Mr. Johnson lacks standing and fails to state a claim upon which relief can be granted. Governor DeSantis additionally argues the matter is unripe. D19 at 13–14. Mr. Johnson opposes the motions. D36, D37. The motions were referred to the undersigned for a report and recommendation. D51.

At a December 2021 status conference, the undersigned discussed staying the case pending a decision in *Ladies Memorial Ass'n v. City of Pensacola*, Appeal No. 20-14003, consolidated with *Ladies Memorial Ass'n v.*

*Florida Secretary of State*, Appeal No. 21-11072, which had been fully briefed. D47, D48. In March 2022, the Court stayed discovery and relieved the parties of their obligation to file a case management report pending a ruling on the motions to dismiss. D50.

In May 2022, the United States Court of Appeals for the Eleventh Circuit decided *Ladies Memorial Ass'n v. City of Pensacola*, 34 F.4th 988 (11th Cir. 2022). At the Court's direction, the parties conferred in good faith to try to resolve the litigation and, unable to do so, D54, filed supplemental briefing on *Ladies Memorial*, D55–D57.

## Complaint Allegations[1]

Mr. Johnson alleges he is "African American (a Black person), the descendant of enslaved African Americans then-held in Confederate states, and a payor of local and state taxes within the jurisdiction." D1 ¶ 6.

Mr. Johnson provides "general allegations" about the Confederacy:

> 9.  The Confederate States of America, also known as the Confederacy, … founded [in] 1860, in treason, included 11 southern states seceding from the United States of America, and caused the Civil War to preserve the enslavement of African

---

[1] A court must construe a pleading drafted by a pro se litigant liberally and hold the pleading to a less stringent standard than one drafted by a lawyer. *Tannenbaum v. United States*, 148 F.3d 1262, 1263 (11th Cir. 1998).

Mr. Johnson has a J.D. but is ineligible to practice law in Florida. *See* Member Profile, The Florida Bar, https://www.floridabar.org/directories/find-mbr/profile/?num=6040 (last visited August 8, 2022).

Whether a court should apply the liberal construction standard to a pleading drafted by a pro se lawyer who is unlicensed is unclear. *Compare, e.g.*, *McNamara v. Brauchler*, 570 F. App'x 741, 743 & n.2 (10th Cir. 2014) (declining to apply liberal construction standard to disbarred lawyer), *with, e.g.*, *Barraza v. United States*, No. EP-09-CR-978-FM-1, 2014 WL 12722887, at *2 n.7 (W.D. Tex. Mar. 12, 2014) (applying liberal construction standard to disbarred lawyer). Regardless of whether the standard applies here, the result is the same.

        Americans (Black people) being held against their will in those states.

10. On March 21, 1861, weeks before the start of the Civil War, Alexander Stephens, the Vice President of the Confederacy, underscored the White supremacy bedrock of the secessionist government in his Cornerstone Speech:

> Our new government is founded upon the great truth that the Negro is not equal to the White man; that slavery, subordination to the superior race, is his natural and normal condition.

        Alexander Stephens, V.P., C.S.A.

11. Following the defeat of the Confederacy in the Civil War, and during Reconstruction that followed, White supremacy organizations emerged such as the Klu [sic] Klux Klan ("KKK"), Knights of the White Camellias and White League, seeking to preserve White supremacy through murder, violence and intimidation in Florida and throughout the country.

12. By 1912 women'[s] auxiliary groups such as the United Daughters of the Confederacy ("UDC"), rose to promote the falsehood of benign ownership of Black Americans and White supremacy; and spread nationally to over 45,000 members and 800 chapters, often defending and working with the KKK to "protect whites from negro rule."

13. In 1914, the in-house historian of the UDC Mississippi chapter, Laura Martin Rose, published The Ku Klux Klan, or Invisible Empire. The daughter of the Confederacy praises the KKK for its work in the field of domestic terror in the years following the Civil War, when Blacks achieved a modicum of political power.

14. "[D]uring the Reconstruction period, sturdy white men of the South, against all odds, maintained white supremacy and secured Caucasian civilization, when its very foundations were threatened within and without," Rose writes. She goes on to provide a look at the roots of racist anti-Black stereotypes and language in this country. For example, she accuses Black people of laziness — and wanting a handout — for refusing to keep working for free for White enslavers, and instead trying to find fortune where the jobs were: "Many negroes conceived the idea that freedom meant cessation from labor, so they left the fields,

>    crowding into the cities and towns, expecting to be fed by the United States Government."

D1 ¶¶ 9–14 (emphasis and citation omitted).

Mr. Johnson provides allegations about certain Confederate monuments and tributes built in North Carolina and Florida and their connection to violent acts against African Americans:

15. In 1926, the UDC erected a monument to the KKK outside of Concord, NC.

16. Eleven years earlier, in 1915, the Florida UDC erected the Florida's Tribute to the Women of the Confederacy, on public land in Jacksonville, in the aptly named Confederate Park.

17. In 1905 and in 1910, the UDC placed Confederate monuments at Lakeland and Ocala, in the Middle District of Florida. There are several other homages to the Confederacy on public land remaining in the Middle District of Florida.

18. Spectacle lynching, massacre, violence, rape, intimidation, divestment of Black-owned land and Jim Crow (White supremacy law) accompanied the placement of Confederate monuments and homages on public land such as the courthouse monument in Palatka, Florida, within the Middle District.

19. Florida accounts for over 250 lynchings of Black people by White mobs, with many occurring in Jacksonville. These murders happened without recourse from state law enforcement or prosecution.

20. In January 1923, the Black township of Rosewood, Florida, in Levy County, was the location of a violent riot by KKK members and other White supremacists, massacring the townspeople, murdering upwards of 150 African Americans and stealing the land, businesses and farms of the residents of Rosewood. No one was ever prosecuted for the crimes.

> 21. In August of 1960, at [James Weldon Johnson Park (formerly known as Hemming Park)²], the site of the Florida Confederate Soldiers Monument in Jacksonville, hundreds of White men armed with ax handles (some dressed as Confederate soldiers) ambushed peaceful Black students protesting Jim Crow law, beating them bloody. The mass assault came to be known as Ax Handle Saturday. No one was ever prosecuted for the crimes.

D1 ¶¶ 15–21 (footnote omitted).

According to Mr. Johnson, almost 1,800 Confederate monuments have been built on "public land in America"; Florida has "dozens of monuments and homages to the Confederacy on tax-funded public land, excluding parks, schools, streets, roads and other publicly funded locations named for the Confederacy or confederates"; and Jacksonville has more than eleven "tributes to the Confederacy on public land, not including schools, streets and roads named for the Confederacy or confederates." D1 ¶¶ 22, 23, 25. Mr. Johnson alleges "[w]hite supremacist organizations, such [as] the KKK, Nazis and others have and continue to use Confederate tribute sites in Florida and throughout the country for rallies and the incitement of violence." D1 ¶ 24.

Mr. Johnson states that in June 2020, Mayor Curry removed the Confederate "mammoth bronze Confederate soldier that stood atop the 40-plus-foot-long pedestal" at James Weldon Johnson Park. D1 ¶ 27. But despite "publicly declar[ing] the City's removal of all other Confederate tributes on public land in Jacksonville," D1 ¶ 27, Mayor Curry has "failed and refused to remove Confederate tributes from public land and the imposing Florida Confederate Soldiers Memorial pedestal remains at the town center square, along with the other Confederate homages throughout the City." D1 ¶ 28. Mr.

---

²Hemming Park was renamed James Weldon Johnson Park in 2020. D1 at 5 n.1.

5

Johnson adds that Governor DeSantis also has "clearly expressed support for maintaining public funding for tributes to the Confederacy." D1 ¶ 29.

Mr. Johnson alleges that Mayor Curry and Governor DeSantis "continue [to] enact general budgetary allocations inuring to the presence, maintenance, preservation and protection of monuments or tributes to the Confederacy on public City and State land, through public tax-based funding, under the color of law." D1 ¶ 30. He further alleges that their conduct is "continuing in nature." D1 ¶ 31.

Mr. Johnson brings a single count against both defendants for "VIOLATION OF 13TH AMENDMENT, 14TH AMENDMENT, FEDERAL DUE PROCESS, EQUAL PROTECTION, CIVIL RIGHTS LAWS UNDER 42 U.S.C. 1981, 1983 and 28 U.S.C. Sections 1343, 2201 et al[.]"[3] D1 at 7. Under that count, he states:

> 34. Plaintiff travels under 42 U.S.C. Section 1983, to enforce Plaintiff's clearly defined rights, under the 13th and 14th Amendment provisions of the United States Constitution, protecting Plaintiff's rights to be free of the badges, indicia and vestiges of slavery and to equal protection under the law.
>
> 35. Defendants' enactment of general budgetary allocations inuring to the presence, maintenance, preservation and protection of monuments or tributes to the Confederacy located on public land, through public funding under color of law, amounts to an intentional governmental endorsement of White supremacy and the ideology that Black Americans are inferior and subhuman, violating Plaintiff's 13th and 14th Amendment protections.
>
> 36. Defendants, with reckless disregard for Plaintiff's rights, further took intentional actions depriving Plaintiff of his equal protection rights by enacting general budgetary allocations inuring to the

---

[3] 28 U.S.C. §§ 1343 and 2201 do not provide a claim for relief. Section 1343 grants federal courts jurisdiction over civil rights cases, and § 2201 grants federal courts the power to enter a declaratory judgment.

> presence, maintenance, preservation and protection of monuments or tributes to the Confederacy on public City and State land, through public tax-based funding, under the color of law.
>
> 37. The fundamental liberties protected by the 14th Amendment's Due Process Clause extend to certain choices to individual dignity and autonomy. Accordingly, courts must exercise reasoned judgment in identifying interests of the person so fundamental that the State must accord them its respect.
>
> 38. The budgetary laws challenged herein burden the liberty of Plaintiff and other African Americans and they abridge central precepts of equality.

D1 ¶¶ 34–38 (citation omitted).

Mr. Johnson states neither defendant is entitled to immunity, including Eleventh Amendment immunity and qualified immunity, because their "conduct was not reasonable" and he seeks no "monetary damages." D1 ¶ 40. He alleges that "[a]s a direct and proximate result of Defendants' conduct alleged in th[e] complaint, Plaintiff has suffered." D1 ¶ 41.

Mr. Johnson requests only equitable relief:

> [1] [A] declaratory judgment under 28 U.S.C. § 2201 "finding the enactment of general budgetary allocations inuring to the presence, maintenance, preservation and protection of monuments or tributes to the Confederacy on public City and State land, through public tax-based funding, to be unconstitutional as violating the 13th and 14th Amendments under color of law[, and]
>
> [2] a permanent injunction, enjoining Defendants from further enacting … general budgetary allocations inuring to the presence, maintenance, preservation and protection of monuments or tributes to the Confederacy on public City and State land, through public tax-based funding, as violating the 13th and 14th Amendments under color of law.

D1 ¶¶ 43, 44.

**Arguments**

Mayor Curry makes these arguments about standing. Mr. Johnson's "vague and conclusory" allegation he "has suffered" is insufficiently concrete and particularized to confer standing. D16 at 6. "[H]ow [the] requested relief … would further [Mr. Johnson's] apparent goal: to eradicate the vestiges of slavery and discrimination in Jacksonville" is unclear. D16 at 7. Mr. Johnson lacks taxpayer standing because "[n]otwithstanding Plaintiff's vague and conclusory allegations suggesting he is a taxpayer and that confederate monuments are maintained with City taxes, Plaintiff has not pled any concrete injury, nor has he alleged any injury that is particular to him and would not equally apply to any other municipal taxpayer." D56 at 4–5.

Mayor Curry makes these arguments about Mr. Johnson's claims. The Fourteenth Amendment claim fails because he makes no "allegations approaching a claim that the monuments have some sort of unequal impact on hi[m.]" D16 at 8. The Thirteenth Amendment claim fails because no applicable federal statute exists. *See* D16 at 9. The "federal due process" claim " remains a mystery and has not been well pled." D16 at 9. Section 1981 is inapplicable because he alleges no "intentional race discrimination against [him] that caused a contractual injury." D16 at 9. And the complaint is a "shotgun" pleading because it "incorporates vague and immaterial allegations." D16 at 10.

Governor DeSantis makes these arguments about standing. Mr. Johnson's "conclusory allegation that he suffered without alleging how he himself suffered in a particular, personal, and individual way, separate or differentiated from others is too vague and abstract to implicate standing or a concrete and particularized injury." D19 at 9–10. Governor DeSantis "is the

wrong party since he is not responsible for the challenged action and does not have some connection to the allegedly unconstitutional act at issue." D19 at 12. Mr. Johnson "challenges what is essentially a nonjusticiable political question and decision in Florida and makes only generalized grievances." D19 at 9. He "must plead but has not pled that his taxes are being used to fund a violation of his constitutional right." D19 at 10.

Governor DeSantis makes these arguments about Mr. Johnson's claims. The Fourteenth Amendment claim fails because he fails to allege unequal treatment or discriminatory intent and identify "any specific fundamental interest that is violated by the alleged enactments." D19 at 17–19. The Thirteenth Amendment claim fails because no "federal legislation" exists "forbidding the maintenance of monuments or tributes to the Confederacy by enactment of 'general budgetary allocations' of state taxes[.]" D19 at 21. And Governor DeSantis is immune from suit under the Eleventh Amendment and "is not a 'person' for purposes of [§ 1983]." D19 at 23–24.

Governor DeSantis also briefly argues Mr. Johnson's claims are unripe because they are "based on sheer speculation about future hypothetical budgets that may never materialize." D19 at 14.

Responding to the defendants' arguments on standing, Mr. Johnson contends "standing has been sufficiently pled":

> Plaintiff provides a clear and plain statement that he is the descendant of enslaved Black people, held in Confederate states prior and during the Civil War; that the Confederacy's cornerstone ideology is White supremacy over Black Americans whose natural state is enslavement to White people; that following the Confederacy's defeat White supremacy organizations emerged to foster White supremacy ideology and, in that effort, erected monuments and tributes to the Confederacy — which are badges of slavery — on City public land — presented, maintained, preserved and protected via Plaintiff's local [and state] tax dollars; that

9

> such amounts to an intentional governmental endorsement of White supremacy and the ideology that Black Americans are inferior and subhuman, infringing upon Plaintiff's liberty, abridging his central precepts of racial equality, violating Plaintiff's 13th and 14th Amendment protections and equal protection rights; and to redress the matter, Plaintiff prays that the Court find the budgetary enactments to be unconstitutional.

D36 at 7–8; D37 at 8–9.

Responding to the defendants' arguments about his claims, Mr. Johnson focuses on the Thirteenth Amendment claim, arguing Confederate monuments and tributes are "badges of slavery" and thus violate the Thirteenth Amendment. D36 at 10; D37 at 14–15. He argues the complaint is not a shotgun pleading because the allegations relate to his claims. D36 at 11. And he argues the Eleventh Amendment is inapplicable because "a suit against an officer of a state directing him to refrain from unconstitutional conduct is not a suit against a state within the meaning of the eleventh amendment[.]" D37 at 15 (quoting *Luckey v. Harris*, 860 F.2d 1012 (11th Cir. 1988)).[4]

## Law

Article III of the United States Constitution grants federal courts jurisdiction over only enumerated categories of "cases" and "controversies."

---

[4] The Eleventh Amendment prohibits a federal court from exercising jurisdiction over an action against a state unless the state has consented to suit or has waived its immunity or Congress has overridden the immunity. *Cross v. State of Ala.*, 49 F.3d 1490, 1502 (11th Cir. 1995). But under the *Ex Parte Young* doctrine, a suit for prospective relief to enjoin a state official from enforcing an unconstitutional act is not a suit against the state and thus is not barred by the Eleventh Amendment. *Scott v. Taylor*, 405 F.3d 1251, 1255 (11th Cir. 2005); *see Ex parte Young*, 209 U.S. 123 (1908).

Generally, a state official sued in his official capacity is not a suable "person" under § 1983. *Will v. Mich. Dep't. of State Police*, 491 U.S. 58, 71 (1989). But a plaintiff may sue a state official in his official capacity under § 1983 for prospective injunctive relief. *Id.* n.10.

U.S. Const. Art. III, § 2. Standing is part of the case or controversy requirement. *Fed. Election Comm'n v. Cruz*, 142 S. Ct. 1638, 1646 (2022).

Standing is a threshold question a court must analyze before addressing the merits of a case. *Gardner v. Mutz*, 962 F.3d 1329, 1339 (11th Cir. 2020). "That threshold requirement ensures that [judges] act *as judges*, and do not engage in policymaking properly left to elected representatives." *Gill v. Whitford*, 138 S. Ct. 1916, 1923 (2018) (internal quotation marks omitted).

A plaintiff must establish standing. *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2207 (2021). To establish standing, a plaintiff must show three elements: "(1) an injury in fact, (2) fairly traceable to the challenged conduct of the defendant, (3) that is likely to be redressed by the requested relief." *Cruz*, 142 S. Ct. at 1646. The injury "must be concrete and particularized and actual or imminent, not conjectural or hypothetical." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (internal quotation marks omitted). A plaintiff seeking declaratory or injunctive relief must prove "a real and immediate threat of future injury" and "a sufficient likelihood that he will be affected by the allegedly unlawful conduct in the future." *Koziara v. City of Casselberry*, 392 F.3d 1302, 1305–06 (11th Cir. 2004). Traceability requires "a causal connection between the injury and the conduct complained of." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). "Redressability is established when a favorable decision would amount to a significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered." *Fla. Wildlife Fed'n, Inc. v. S. Fla. Water Mgmt. Dist.*, 647 F.3d 1296, 1303–04 (11th Cir. 2011).

"[A]t the pleading stage, the plaintiff must clearly allege facts demonstrating each element." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016),

11

*as revised* (May 24, 2016) (internal quotation marks omitted). The plaintiff must show "standing for each claim he seeks to press" and "for each form of relief" sought. *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008). When ruling on a motion to dismiss, the court "must evaluate standing based on the facts alleged in the complaint" and "may not speculate concerning the existence of standing or piece together support for the plaintiff." *Duty Free Ams., Inc. v. Estee Lauder Cos.*, 797 F.3d 1248, 1271 (11th Cir. 2015).

"Absent special circumstances … standing cannot be based on a plaintiff's mere status as a taxpayer." *Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 134 (2011). But the general prohibition against taxpayer standing may be inapplicable to municipal taxpayers. *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 349 (2006) (recognizing the Supreme Court has "noted with approval the standing of municipal residents to enjoin the 'illegal use of the moneys of a municipal corporation,' relying on 'the peculiar relation of the corporate taxpayer to the corporation' to distinguish such a case from the general bar on taxpayer suits" (quoting *Commonwealth of Mass. v. Mellon*, 262 U.S. 447, 486 (1923))); *Protect Our Parks, Inc. v. Chi. Park Dist.*, 971 F.3d 722, 733–34 (7th Cir. 2020) (recognizing the Supreme Court's distinction between federal and municipal taxpayers "remains undisturbed" but observing "it has grown increasingly anomalous"), *cert. denied sub nom. Protect Our Parks, Inc. v. City of Chicago, Illinois*, 141 S. Ct. 2583 (2021); *Smith v. Jefferson Cnty. Bd. of Sch. Comm'rs*, 641 F.3d 197, 210 (6th Cir. 2011) (recognizing that "[p]laintiffs seeking to establish municipal-taxpayer standing are required to meet a less rigorous injury standard than those seeking standing as federal or state taxpayers" and "may fulfill the injury requirement by pleading an alleged misuse of municipal funds"); *Pelphrey v. Cobb Cnty.*, 547 F.3d 1263, 1280 (11th Cir. 2008) (recognizing "[t]he standing of municipal taxpayers to challenge, as

12

unconstitutional, expenditures by local governments remains settled law" and holding "[m]unicipal taxpayers have standing to challenge unconstitutional expenditures if their interest is direct and immediate" (internal quotation marks omitted)).

A complaint must contain "a short and plain statement of the grounds for the court's jurisdiction," "a short and plain statement of the claim showing that the [plaintiff] is entitled to relief," and "a demand for the relief sought, which may include relief in the alternative or different types of relief." Fed. R. Civ. P. 8(a). If "doing so would promote clarity, each claim founded on a separate transaction or occurrence … must be stated in a separate count[.]" Fed. R. Civ. P. 10(b). Any matter in a complaint that is "redundant, immaterial, impertinent, or scandalous" is subject to being stricken. Fed. R. Civ. P. 12(f).

The United States Supreme Court explained the pleading standard in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). The standard does not require detailed factual allegations but requires "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678. Labels, conclusions, formulaic recitations of the elements, and "naked assertions devoid of further factual enhancement" are insufficient. *Id.* (cleaned up). The rule "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Id.* at 678–79.

A complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Id.* at 678. A claim is plausible on its face if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct

13

alleged." *Id.* Plausibility differs from probability, "but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

Shotgun pleadings are generally categorized into four types: (1) "a complaint containing multiple counts where each count adopts the allegations of all preceding counts, causing each successive count to carry all that came before and the last count to be a combination of the entire complaint"; (2) a complaint "replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action"; (3) a complaint that fails to "separate each cause of action or claim for relief into a different count"; and (4) a complaint that "assert[s] multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against." *Barmapov v. Amuial*, 986 F.3d 1321, 1324–25 (11th Cir. 2021) (alteration in original). "The unifying characteristic of all types of shotgun pleadings is that they fail to one degree or another, and in one way or another, to give the defendants adequate notice of the claims against them and the grounds upon which each claim rest." *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1323 (11th Cir. 2015).

A shotgun pleading makes it "virtually impossible to know which allegations of fact are intended to support which claim(s) for relief." *Paylor v. Hartford Fire Ins. Co.*, 748 F.3d 1117, 1126 (11th Cir. 2014). The Eleventh Circuit has "roundly, repeatedly, and consistently" condemned shotgun pleadings. *Id.* at 1125. "[I]f, in the face of a shotgun complaint, the defendant does not move the district court to require a more definite statement, the court, in the exercise of its inherent power, must intervene sua sponte and order a repleader." *Byrne v. Nezhat*, 261 F.3d 1075, 1133 (11th Cir. 2001); *cf. Vibe Micro, Inc. v. Shabanets*, 878 F.3d 1291, 1296 (11th Cir. 2018) ("When a litigant

14

files a shotgun pleading, is represented by counsel, and fails to request leave to amend, a district court must sua sponte give him one chance to replead before dismissing his case with prejudice on non-merits shotgun pleading grounds.").

## Analysis

Mr. Johnson's complaint is a shotgun pleading because it is replete with vague allegations and fails to separate into a different count each claim for relief. Due to the shotgun nature of the pleading and the absence of factual allegations about the challenged conduct and the alleged injury, the Court cannot conduct a standing analysis.

Regarding injury, Mr. Johnson merely asserts, without more, that because of unspecified budgetary allocations, he "has suffered," D1 ¶ 41, he has been deprived of his equal protection rights, D1 ¶ 36, and his rights under the Thirteenth and Fourteenth Amendments have been violated, D1 ¶ 35. He alleges no facts regarding the nature of the "general budgetary allocations," merely alleging they "inure" to the "presence, maintenance, preservation, and protection" of Confederate monuments and tributes. How the allocations specifically affect the monuments and tributes or how his local or state taxes are used in those allocations is not alleged.

Also unclear is the specific conduct about which Mr. Johnson complains. In his "general allegations," D1 at 2, about the history of the Civil War and subsequent construction of Confederate monuments, he specifically references two monuments in Jacksonville and a "courthouse monument" in Palatka, and he generally refers to other monuments by the United Daughters of the Confederacy placed in the Middle District of Florida, including Lakeland and

15

Ocala. D1 ¶ 17. But he fails to allege which monuments or "tributes" are affected by the budgetary allocations. He references "parks, schools, streets, roads and other publicly funded locations named for the Confederacy or confederates," D1 ¶¶ 22, 25, but he specifies none, and whether they are also included in his claim and extend outside of Jacksonville is unclear. Moreover, he fails to allege the specific conduct attributed to each defendant (i.e., each defendant's precise role in the challenged "enactments").

Despite asserting what appears to be multiple claims (violations of his rights under the Thirteenth Amendment and his due-process and equal-protection rights under the Fourteenth Amendment) under two statutes (42 U.S.C. §§ 1981, 1983) seeking two types of relief (injunctive and declaratory) against two defendants (a city mayor and a state governor), he asserts only one count. And the count itself references only § 1983. *See generally* D1 ¶¶ 32–42. He also fails to state whether he is asserting a procedural due process claim or a substantive due process claim, and he identifies no specific interest being violated under the Fourteenth Amendment. Mr. Johnson's failure to separate into a different count and sufficiently describe each claim for relief violates the pleading requirements.

The complaint also lacks sufficient factual allegations about the claims for relief. Without a well-pleaded complaint, the Court cannot determine whether, if standing is present, Mr. Johnson has plausibly stated a claim for relief.

Mr. Johnson's conclusory allegations and failure to address each claim for relief separately fails to give adequate notice of the claims against the defendants. *See Iqbal*, 556 U.S. at 678; *Weiland*, 792 F.3d at 1323. And because the injury alleged is vague and the challenged conduct is unspecified, the Court

cannot determine whether an injury-in-fact fairly traceable to the defendants' conduct exists.

At the December 2021 status conference, Mr. Johnson asserted discovery in the case will entail "the chain that begins with … [his] taxpayer dollars, and how they make their way to the benefit of these confederate monuments that [he is] complaining about." D48 at 22. Though discovery on this issue may be needed to allege an adequate factual basis for taxpayer or other standing, the scope of discovery is difficult, if not impossible, to define due to the vagueness of the complaint (particularly, the lack of specificity about which monuments or "tributes" Mr. Johnson challenges).

Thus, the Court **strikes** the complaint and **directs** Mr. Johnson to file an amended complaint that complies with the pleading rules. He must file the amended complaint by **September 8, 2022**. The motions to dismiss the complaint, D16, D19, are **denied** without prejudice.

**Ordered** in Jacksonville, Florida, on August 8, 2022.

_____
PATRICIA D. BARKSDALE
United States Magistrate Judge

c:  Counsel of record (via CM/ECF)

   Earl M. Johnson, Jr. (via USPS and email)
   1635 North Liberty Street, No. 3
   Jacksonville, FL 32206
   earlmayberryjohnson@gmail.com