United States District Court
Middle District of Florida
Jacksonville Division

EARL M. JOHNSON, JR.,

     *Plaintiff,*

v.                                                          NO. 3:21-cv-726-MMH-PDB

LENNY CURRY AND RONALD DESANTIS,

     *Defendants.*

_____

## Report and Recommendation on
## Motions to Dismiss (D72, D73) and for a Speedy Hearing (D66)

    Earl M. Johnson, Jr., proceeding pro se, sues the Mayor of the City of Jacksonville, Florida (referred to here as "the City"), and the Governor of the State of Florida, both in their official capacities.[1] Mr. Johnson asks the Court to declare that any city or state budgetary enactment supporting a public place in the Middle District of Florida named after a Confederate soldier or serving as the site for a Confederate-related monument, flag, or program violates his rights under federal statutory and constitutional law.

    The Court struck the original and amended complaints because they were "shotgun pleadings." D58, D61. With leave, Mr. Johnson filed a second

---

[1]"[A]n official-capacity suit is … treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). Applying this law, the City responds in place of the Mayor. *See* D72 at 1 n.1.

amended complaint.[2] D63. The defendants now move to dismiss that complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) on the grounds this Court lacks subject-matter jurisdiction and Mr. Johnson fails to state a claim on which relief can be granted. D72,[3] D73.[4] For his part, Mr. Johnson

---

[2]The defendants move to dismiss the second amended complaint under Federal Rules of Civil Procedure 8(a)(2) and 10(b) on the ground that it too is a shotgun pleading. D72 at 19–20; D73 at 23.

Rule 8(a)(2) provides, "A pleading that states a claim for relief must contain … a short and plain statement of the claim showing that the pleader is entitled to relief[.]" Rule 10(b) provides, "A party must state its claims or defenses in numbered paragraphs, each limited as far as practicable to a single set of circumstances." A shotgun pleading is a pleading that violates procedural rules and fails "to one degree or another, and in one way or another, to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests." *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1323 (11th Cir. 2015).

The City argues the second amended complaint is a shotgun pleading because it includes assertedly immaterial allegations about the Civil War and incorporates those allegations into every count. D72 at 19–20. The Governor does not explain why he believes the second amended complaint is a shotgun pleading. *See* D73 at 23. Mr. Johnson argues he fixed the pleading problems the Court earlier identified. D76 at 17.

Contrary to the defendants' argument, the second amended complaint is not a shotgun pleading because it gives the defendants adequate notice of the claims against them and the grounds upon which each claim rests, as evidenced by the motions to dismiss themselves, which aptly describe the asserted claims and alleged facts intended to support the claims. *See generally* D72, D73. Dismissal on this procedural ground is unwarranted.

[3]The City states it also brings its motion under Federal Rule of Civil Procedure 12(e). D72 at 1. Rule 12(e) provides, "A party may move for a more definite statement of a pleading to which a responsive pleading is allowed but which is so vague or ambiguous that the party cannot reasonably prepare a response." The City neither asks the Court to order Mr. Johnson to provide a more definite statement as an alternative to dismissal nor contends his allegations are so vague or ambiguous the City cannot reasonably prepare a response. *See generally* D72. No further discussion of Rule 12(e) is necessary.

[4]The Governor states he also brings his motion under Federal Rule of Civil Procedure 21. D73 at 1, 5. Rule 21 provides, "Misjoinder of parties is not a ground for dismissing an action. On motion or on its own, the court may at any time, on just terms, add or drop a party. The court may also sever any claim against a party." The Governor does not contend he has been improperly joined or a different person or entity should have been joined with the City in his stead; rather, he contends Mr. Johnson fails to show traceability required for standing because the Governor "is not responsible for the

moves for a speedy hearing under Federal Rule of Civil Procedure 57 because, according to him, no fact is disputed and no discovery is necessary. D66.

The Court referred the motions to the undersigned for a report and recommendation "regarding an appropriate resolution[.]" D74. The undersigned recommends granting the motions to dismiss in part, dismissing the action without prejudice for lack of subject-matter jurisdiction, and directing the clerk to terminate the motion for a speedy hearing.

## I.     Allegations

In the second amended complaint, Mr. Johnson alleges he is a "United States citizen" and an "African American (a Black person), the descendant of enslaved African Americans then-held in Confederate states, and a payor of local and state taxes within the jurisdiction." D63 ¶¶6, 47. He states:

> 9.    The Confederate States of America, also known as the Confederacy, was founded [in] 1860, in treason, included 11 southern states seceding from the United States of America, and caused the Civil War to preserve the enslavement of African Americans (Black people).

> 10.   On March 21, 1861, weeks before the start of the Civil War, Alexander Stephens, the Vice President of the Confederacy, underscored the White supremacy bedrock of the secessionist government in his Cornerstone Speech, in which he proclaimed the Confederate ideal of perpetual inferiority of Black people to their White countrymen:

---

challenged action and does not have some enforcement connection to an alleged unconstitutional act." *See* D73 at 14–15. The undersigned does not read the Governor's motion as a request to drop him as a mis-joined party under Rule 21. Further discussion of Rule 21 is unnecessary.

> Our new government is founded upon the great truth that the Negro is not equal to the White man; that slavery, subordination to the superior race, is his natural and normal condition.

> Alexander Stephens, V.P., C.S.A.

11. The designer of the Confederate Battle Flag, William Thompson, gave it the moniker "the White man's flag."

12. Following the defeat of the Confederacy in the Civil War, and during Reconstruction that followed, White supremacy organizations emerged such as the Klu [sic] Klux Klan ("KKK"), Knights of the White Camellias and White League, seeking to preserve White supremacy through murder, violence and intimidation within the Middle District of Florida.

13. By 1912 women'[s] auxiliary groups such as the United Daughters of the Confederacy ("UDC"), within the Middle District of Florida, rose to promote the falsehood of benign ownership of Black Americans and White supremacy; working with the KKK to "protect whites from negro rule."

*Id*. ¶¶9–13 (emphasis omitted).

Mr. Johnson alleges "there are approximately 47[] monuments and naming tributes to the Confederacy and White supremacists on tax-funded public land, including counties, a county census district, school district names, parks, schools, streets, roads, programs, a courthouse mural, and a government building flying the Confederate Battle Flag[.]" *Id*. ¶14. He alleges these include but are "not limited to":

**Alachua**

- Sidney Lanier Center

**Baker**

- Baker County

4

- Baker County School District
- Baker County Pre-K/Kindergarten
- Baker County Middle School
- Baker County High School
- Robert E. Lee Lane
- Baker County Courthouse Mural Depicting Hooded KKK Members Riding Horseback

**Bradford**

- Bradford County
- Bradford County School District
- Bradford County Middle School
- Bradford County High School

**Columbia**

- Olustee Confederate Battle Monument at State Park

**Duval**

- Florida Confederate Soldiers Memorial Pedestal at City Park
- Monument to Women of the Confederacy at City Park
- Yellow Bluff Fort Monument at State Park
- Confederate Point Road
- Confederate Street
- Confederate Point Road [sic]
- Stonewall (Jackson) Street
- (Stonewall) Jackson Street
- (Jefferson) Davis Street
- Jefferson (Davis) Street

5

**Hamilton**

- Confederate Monument at County Courthouse Lawn

**Hendry**

- Hendry County
- Hendry County School District

**Hernando**

- Confederate Soldier Monument at County Courthouse Lawn

**Hillsborough**

- Lanier Elementary School
- Robert E. Lee Road
- Stonewall Jackson Elementary School

**Lee**

- Lee County
- Lee County School District
- Lee County Adolescent Mothers Program
- Lee County Memorial Hospital

**Madison**

- Confederate Monument at State Park

**Manatee**

- Judah P. Benjamin Confederate Memorial at State Park

6

**Marion**

- Confederate Flag at County Government Building

**Nassau**

- Yulee County Census Division
- General Lee Road

**Pasco**

- Pasco County
- Pasco County School District
- Pasco County Elementary School
- Pasco County High School

**Putnam**

- Robert E. Lee Drive
- Confederate Monument at County Courthouse Lawn

**Suwannee**

- Confederate Monument at State Park

**Volusia**

- Confederate Oak at City Park

*Id.* ¶14.

Mr. Johnson alleges, "During the last four (4) years, [he] has traveled through or visited most all of the public locations above-identified within the

Middle District of Florida."[5] *Id.* ¶15. He alleges he "is deeply repulsed, disheartened, and intimidated by the governmental celebrations of White supremacy against him as a Black American." *Id.* ¶16. He alleges his "deep repulsion, disheartenment, and intimidation are reasonable" because "White supremacist organizations, such [as] the KKK, Nazis and other race hate groups have and continue to use Confederate tribute sites within the Middle District of Florida to celebrate White supremacy ideals, and to encourage the incitement of intimidation and violence against Black Americans" like him. *Id.* ¶17.

Mr. Johnson alleges the defendants continue "to maintain public funding for tributes to the Confederacy, Confederates and White supremacists on public land" within the Middle District of Florida, including, with respect to the City, "monuments, tributes, streets, roads, and parks," and, with respect to the Governor, "monuments, tributes, namings, counties, programs, governmental buildings, streets, roads, parks, courthouses, and a census district[.]" *Id.* ¶¶18, 19. He alleges the defendants "continue [to] enact general budgetary allocations inuring to the presence, maintenance, preservation and protection of monuments and/or naming tributes to the Confederacy, Confederates and White supremacists on public land, within the Middle

---

[5]Two places or things Mr. Johnson identifies are in the Northern District of Florida, not the Middle District of Florida; specifically, the Sidney Lanier Center in Alachua County and the Confederate Monument at State Park in Madison County. *See* 28 U.S.C. § 89 (statute dividing Florida into three judicial districts and placing Alachua and Madison counties in the Northern District of Florida). Mr. Johnson appears to recognize the error in a later paper. *Compare* D63 ¶14 (second amended complaint describing 47 places or things), *with* D66 at 2 (Mr. Johnson's motion for a speedy hearing in which he writes, "Plaintiff's allegation that approximately 45 tributes to the Confederacy … exist … within the Middle District of Florida is not a question of fact[.]"). The error is immaterial to the arguments raised in the motions to dismiss.

District of Florida, through public tax-based funding, under the color of law."
*Id.* ¶20. He alleges their conduct is "continuing in nature." *Id.* ¶21.

## II.   Claims for Relief[6]

Under five counts, Mr. Johnson asks the Court to provide declaratory
relief under the Declaratory Judgment Act. D63 ¶¶22–71. The Act provides,

---

[6]Mr. Johnson has a J.D. but was disbarred in 2019 and remains ineligible to
practice law in Florida. *See* The Florida Bar, Member Profile, "Earl Mayberry Johnson,
Jr.," https://www.floridabar.org/directories/find-mbr/profile/?num=6040 (last visited Apr.
4, 2023).

"Pleadings must be construed so as to do justice." Fed. R. Civ. P. 8(e). A court must
construe a pleading by a pro se litigant liberally and hold the pleading to a less stringent
standard than one drafted by a lawyer. *Tannenbaum v. United States*, 148 F.3d 1262,
1263 (11th Cir. 1998). Liberal construction does not mean excusing noncompliance with
procedural rules. *McNeil v. United States*, 508 U.S. 106, 113 (1993). Liberal construction
does not mean forgiving the absence of a factual basis for a claim. *Jones v. Fla. Parole
Comm'n*, 787 F.3d 1105, 1107 (11th Cir. 2015). And liberal construction does not mean
rewriting a deficient pleading or otherwise serving as de facto counsel. *GJR Invs., Inc. v.
Cnty. of Escambia*, 132 F.3d 1359, 1369 (11th Cir. 1998), *overruled on other grounds as
recognized by Schwarz v. Ga. Composite Med. Bd.*, No. 21-10288, 2021 WL 4519893, at
*2 (11th Cir. Oct. 4, 2021). Rather, liberal construction means a federal court sometimes
must "look beyond the labels used in a pro se party's complaint and focus on the content
and substance of the allegations" to determine if a cognizable remedy is available. *Torres
v. Mia.-Dade Cnty.*, 734 F. App'x 688, 691 (11th Cir. 2018). Construing the complaint in
that manner avoids an unnecessary dismissal, avoids an inappropriately stringent
application of a formal labeling requirement, and creates "a better correspondence"
between the substance of the claim and its legal basis. *Castro v. United States*, 540 U.S.
375, 381–82 (2003).

The former Fifth Circuit refused to apply the liberal-amendment standard in a
case by a licensed attorney representing himself. *Olivares v. Martin*, 555 F.2d 1192, 1194
n.1 (5th Cir. 1977). The Eleventh Circuit refused to apply the standard in a bankruptcy
case by a licensed "veteran bankruptcy attorney" who is "familiar with the federal
bankruptcy rules, the federal bankruptcy code, and local practice in the Middle District
of Florida[.]" *In re Ford*, No. 20-13977, 2021 WL 4129376, at *2 (11th Cir. Sept. 10, 2021).

Whether the liberal-amendment standard applies under the circumstances here—
where a disbarred attorney with unspecified experience is representing himself—is
unclear. *Compare, e.g.*, *McNamara v. Brauchler*, 570 F. App'x 741, 743 & n.2 (10th Cir.
2014) ("[C]ases from this circuit concern licensed attorneys proceeding pro se. ... [The
plaintiff] is no longer a licensed attorney, as he was disbarred ... . Nevertheless, the

"In a case of actual controversy within its jurisdiction ... any court of the United States ... may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). "Any such declaration shall have the force and effect of a final judgment or decree[.]"[7] *Id.* The Federal Rules of Civil Procedure

---

purpose behind affording a liberal construction to pro se filings ... would not be furthered by construing [his] filings liberally. We see no reason to hold [him] to a less stringent standard than other legally trained individuals." (emphasis omitted)), *with Barraza v. United States*, No. EP-13-cv-39-FM, No. EP-09-CR-978-FM-1, 2014 WL 12722887, at *2 n.7 (W.D. Tex. Mar. 12, 2014) ("The Court notes the Texas State Bar disbarred Barraza ... . Accordingly, the Court will treat [him] as a pro se movant.").

The City observes the issue is unclear. D72 at 4 n.3. The Governor argues the standard should not apply under the circumstances. D73 at 5–6. This Court need not decide whether the standard applies because the result is the same regardless.

[7] The Governor argues the Court should deny declaratory relief because the remedy is equitable and Mr. Johnson does not have "clean hands" insofar as he impermissibly requests "an advisory opinion on an abstract, hypothetical, or contingent question." D73 at 21–22.

District courts generally "have a virtually unflagging obligation to exercise the jurisdiction conferred on them by Congress." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 284 (1995) (internal quotation marks and quoted authority omitted). But "[b]y the Declaratory Judgment Act, Congress ... created an opportunity, rather than a duty, to grant a new form of relief to qualifying litigants." *Id.* at 288. "Consistent with the nonobligatory nature of the remedy, a district court is authorized, in the sound exercise of its discretion, to stay or to dismiss an action seeking a declaratory judgment before trial or after all arguments have drawn to a close." *Id.* "In the declaratory judgment context, the normal principle that federal courts should adjudicate claims within their jurisdiction yields to considerations of practicality and wise judicial administration." *Id.*

"A declaratory judgment action is a statutory creation, and by its nature is neither fish nor fowl, neither legal nor equitable." *Am. Safety Equip. Corp. v. J. P. Maguire & Co.*, 391 F.2d 821, 824 (2d Cir. 1968). A district court's discretion in deciding whether to grant or deny declaratory relief "should be exercised liberally in favor of granting such relief in order to accomplish the purposes of the Declaratory Judgment Act." *Cincinnati Ins. Co. v. Holbrook*, 867 F.2d 1330, 1333 (11th Cir. 1989), *abrogated on other grounds by Wilton*, 515 U.S. 277. The primary purpose of the Act is to "avoid accrual of avoidable damages to one not certain of his rights and to afford him an early adjudication without waiting until his adversary should see fit to begin suit, after damage had accrued." *Cunningham Bros. v. Bail*, 407 F.2d 1165, 1167–68 (7th Cir. 1969) (internal quotation marks and quoted authority omitted).

"govern the procedure for obtaining a declaratory judgment under … § 2201." Fed. R. Civ. P. 57.

In each count, Mr. Johnson says he "travels under" 42 U.S.C. § 1983. D63 ¶¶24, 36, 46, 56, 64. The statute provides, "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State … subjects, or causes to be subjected, any citizen of the United States … to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]" 42 U.S.C. § 1983. Through this language, § 1983 provides a federal cause of action against any "person"[8] who, acting under color of state law, deprives another of a federal right.[9] *Conn v. Gabbert*, 526 U.S. 286, 290 (1999).

---

[8] This Court need not decide whether to decline to exercise jurisdiction under the Declaratory Judgment Act, if any, because a jurisdictional ground for dismissal exists.

[8] Neither a state nor an official of the state acting in an official capacity is a "person" within the meaning of § 1983. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). "Of course a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because official-capacity actions for prospective relief are not treated as actions against the State." *Id.* at 71 n.10 (internal quotation marks and quoted authority omitted). Here, the Governor does not contend he is not a "person" under § 1983 for purposes of this action. *See generally* D73.

"Local governing bodies … can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where … the action that is alleged to be unconstitutional implements or executes a … decision officially adopted and promulgated by that body's officers." *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 690 (1978). "[M]unicipal liability under § 1983 [for a single decision] attaches where … a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986). Here, the City does not contend it cannot be sued under § 1983 in this action. *See generally* D72.

[9] "Section 1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (internal quotation marks and quoted authority omitted). "The first step … is to identify the specific [federal] right allegedly infringed." *Id.* "The validity of the

In count I, Mr. Johnson asks the Court to declare "the alleged conduct" violates Title II of the Civil Rights Act of 1964 ("Injunctive Relief Against Discrimination in Places of Public Accommodation"), codified at 42 U.S.C. § 2000a to § 2000a-6. D63 at 11. The section of the Act on which Mr. Johnson relies provides, "All persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation ... without discrimination or segregation on the ground of race, color, religion, or national origin." 42 U.S.C. § 2000a(a).

In count II, Mr. Johnson asks the Court to declare "the alleged conduct" violates the Thirteenth Amendment to the United States Constitution. D63 at 13. The amendment provides, "Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction." U.S. Const. amend. XIII, § 1.

In count III, Mr. Johnson asks the Court to declare "the alleged conduct" violates the substantive component of the Due Process Clause of the Fourteenth Amendment to the United States Constitution. D63 at 15. The clause provides, "[N]or shall any State deprive any person of life, liberty, or property, without due process of law[.]" U.S. Const. amend. XIV, § 1.

In count IV, Mr. Johnson asks the Court to declare "the alleged conduct" violates the Equal Protection Clause of the Fourteenth Amendment. D63 at 17. The clause provides, "[N]or shall any State ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

---

claim must then be judged by reference to the specific ... standard which governs that right[.]" *Graham v. Connor*, 490 U.S. 386, 394 (1989).

In count V, Mr. Johnson asks the Court to declare "the alleged conduct" violates 42 U.S.C. § 1981. D63 at 18. The statute provides, "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." 42 U.S.C. § 1981(a).

In each count, Mr. Johnson repeats the statement that the right identified is violated by "Defendants' enactment of general budgetary allocations inuring to the presence, maintenance, preservation and protection of monuments, tributes and/or namings to the Confederacy, Confederates, and White supremacists, located on public land, including counties, a census division, buildings and programs, through public funding under color of [law, amounting] to an intentional governmental endorsement of White supremacy and the ideology that Plaintiff, a Black American, is inferior and subhuman[.]" D63 ¶¶28, 37, 48, 57, 65.

In each count, Mr. Johnson repeats the same language or nearly the same language: "Defendants' conduct is not rationally based upon some legitimate purpose"; "Neither Defendant is entitled to immunity, whether Eleventh Amendment, Qualified or otherwise because the conduct was not reasonable"; "Plaintiff does not seek monetary damages"; "As a direct and proximate result of Defendants' conduct alleged in this complaint, Plaintiff has suffered [been injured]"; and "Plaintiff has exhausted all conditions perquisite [sic]." D63 ¶¶29–33, 39–43, 49–53, 58–62, 67–71.

For count I (Title II), Mr. Johnson adds, "The budgetary enactments … burden the liberty of Plaintiff, a Black American, as they abridge central precepts of equality based upon race and color." *Id.* ¶27. For count II (Thirteenth Amendment), he adds, "The budgetary enactments … burden the liberty of Plaintiff, a Black American, as they abridge central precepts of equality and amount to badges, indicia and vestiges of slavery." *Id.* ¶38. For count V (§ 1981), he adds the defendants' conduct is intentional. *Id.* ¶66.

## III.   Motions

### A.   *Defendants' Motions to Dismiss*

For their subject-matter-jurisdiction argument, the defendants focus on standing. *See* D72 at 5–10; D73 at 7–15. For their alternative failure-to-state-a-claim argument, the defendants focus on plausibility. *See* D72 at 10–19; D73 at 15–21. Mr. Johnson counters their arguments. *See* D76 at 4–17; D79 at 3–20. Because subject-matter jurisdiction is a threshold issue, the undersigned begins the analysis there.

### 1.   *Subject-Matter Jurisdiction*

#### a.   Standards

"Federal courts are courts of limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). A federal court therefore has a "special obligation" to verify it has jurisdiction before proceeding to the merits.[10] *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 95 (1998).

---

[10]When "a plaintiff fails to plausibly allege an element that is both a merit element of a claim and a jurisdictional element, the district court may dismiss the claim" for lack

Under Federal Rule of Civil Procedure 12(b)(1), a party can move to dismiss for lack of subject-matter jurisdiction. A jurisdictional attack may be "facial" or "factual." *Gardner v. Mutz*, 962 F.3d 1329, 1340 (11th Cir. 2020). A facial attack challenges jurisdiction based on the complaint allegations; a factual attack challenges jurisdiction regardless of the allegations. *Id.* When a defendant files only a Rule 12(b)(1) motion to dismiss without evidence, as here, the attack is a facial attack. *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. May 8, 1981). When deciding a motion to dismiss for lack of jurisdiction based on a facial attack, a court accepts the factual allegations in the complaint as true and "construe[s] the complaint in favor of the complaining party."[11] *Warth v. Seldin*, 422 U.S. 490, 501 (1975).

---

of subject-matter jurisdiction, failure to state a claim on which relief can be granted, or both. *Brownback v. King*, 141 S. Ct. 740, 749 n.8 (2021). When there is no overlap, a district court errs by considering the merits in lieu of standing. *Gardner v. Mutz*, 962 F.3d 1329, 1340 (11th Cir. 2020). No party here contends the merits and jurisdictional elements overlap. *See generally* D72, D73, D76, D79.

[11]The Governor appears to ask the Court to judicially notice his role in the state government to determine standing. *See generally* D73 at 5, 9, 14–15. Mr. Johnson contends the Governor is both facially and factually attacking subject-matter jurisdiction and goes on to state, "Presently, the evidence, public record and thought overwhelming [sic] that tributes to the Confederacy are monuments to white supremacy and badges of slavery[.]" D79 at 8. He cites law journals and research papers to that effect. D79 at 9–10.

At any stage of a case and on its own, a court may judicially notice a fact that cannot be reasonably disputed because it either is generally known or can be readily and accurately determined from sources whose accuracy cannot reasonably be questioned. Fed. R. Evid. 201(b)–(d). A court may judicially notice a fact to decide a Rule 12(b)(1) motion to dismiss for lack of subject-matter jurisdiction, *see Boatman v. Town of Oakland*, 76 F.3d 341, 345 n.10 (11th Cir. 1996), and a Rule 12(b)(6) motion to dismiss for failure to state a claim on which relief can be granted, *see Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

The Governor's role in the state government is appropriate for judicial notice because a Florida governor's role is generally known or can be readily and accurately determined from a source whose accuracy cannot reasonably be questioned (i.e., the Florida Constitution) and would not convert his attack on subject-matter jurisdiction into a factual one. Regardless, judicially noticing any fact for the Governor is unnecessary

Applying these standards here, the Court must accept the factual allegations in the second amended complaint as true and construe the pleading in Mr. Johnson's favor.

b.     Case or Controversy

"The Constitution confers limited authority on each branch[.]" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 337 (2016). The Constitution vests Congress with enumerated "legislative Powers," U.S. Const. art. I, § 1; the President with "[t]he executive Power," U.S. Const. art. II, § 1, cl. 1; and federal courts with "[t]he judicial Power of the United States," U.S. Const. art. III, § 1. "[T]o remain faithful to this tripartite structure, the power of the Federal Judiciary may not be permitted to intrude upon the powers given to the other branches." *Spokeo*, 578 U.S. at 337.

The Constitution "does not fully explain" the phrase "[t]he judicial Power of the United States." *Id.* But the Constitution "does specify that this power extends only to 'Cases' and 'Controversies.'"[12] *Id.* (quoting U.S. Const. art. III,

---

because this Court need not decide the arguments raised by the Governor that depend on his role in Florida's government (traceability and redressability required for standing). To the extent Mr. Johnson asks this Court to judicially notice the meaning of any and all Confederate-related places or things, this Court may not; that meaning is neither generally known nor readily and accurately determined from a source whose accuracy cannot be reasonably questioned.

    [12]The Declaratory Judgment Act under which Mr. Johnson sues applies only to a "case of actual controversy." 28 U.S.C. § 2201(a). That statutory phrase refers to the type of "Cases" and "Controversies" justiciable under Article III. *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007). "Congress limited federal jurisdiction under the … Act to actual controversies, in statutory recognition of the fact that federal judicial power under Article III, Section 2 of the United States Constitution extends only to concrete 'cases or controversies.'" *Atlanta Gas Light Co. v. Aetna Cas. & Sur. Co.*, 68 F.3d 409, 414 (11th Cir. 1995). The "threshold question" under the Act "is whether a justiciable controversy exists." *Id.*

§ 2). The case-and-controversy requirement serves "to identify those disputes which are appropriately resolved through the judicial process." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (quoted authority omitted).

c.   Ordinary Standing

The case-and-controversy requirement has three "strands": standing, ripeness, and mootness.[13] *Gardner*, 962 F.3d at 1336. Standing—the strand at issue here—"limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong," *Spokeo*, 578 U.S. at 338,

---

This threshold question under the Act is answered here by answering whether the case-or-controversy requirement is satisfied.

[13]The "political question doctrine" may be a "fourth strand" of the case-and-controversy requirement. *Gardner*, 962 F.3d at 1336 n.6. "From the Founding to today, the Supreme Court has acknowledged that some questions can be answered only by the political branches." *PDVSA US Litig. Tr. v. LukOil Pan Americas LLC*, No. 22-10675, 2023 WL 2469178, at *3 (11th Cir. Mar. 13, 2023) (to be published). Under the doctrine, a case must be dismissed if one or more of these characteristics is present: (1) "a textually demonstrable constitutional commitment of the issue to a coordinate political department"; (2) "a lack of judicially discoverable and manageable standards for resolving" the issue; (3) "impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion"; (4) "the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government"; (5) "an unusual need for unquestioning adherence to a political decision already made"; or (6) "the potentiality of embarrassment from multifarious pronouncements by various departments on one question." *Carmichael v. Kellogg, Brown & Root Servs., Inc.*, 572 F.3d 1271, 1280 (11th Cir. 2009) (quoted authority omitted). The doctrine recognizes "that the judicial department has no business entertaining [a] claim of unlawfulness" where "the question is entrusted to one of the political branches or involves no judicially enforceable rights." *Rucho v. Common Cause*, 139 S. Ct. 2484, 2494 (2019). "In such a case the claim is said to present a 'political question' and to be nonjusticiable—outside the courts' competence and therefore beyond the courts' jurisdiction." *Id.*

The Governor generally contends Mr. Johnson "challenges what is essentially a nonjusticiable political question and decision in Florida." D73 at 11. The City generally describes the issues presented as political in nature. D72 at 2, 20. This Court need not decide whether the political-question doctrine applies because another jurisdictional ground for dismissal exists.

asking "whether a particular plaintiff even has the requisite stake in the litigation to invoke the federal 'judicial Power' in the first place," *Gardner*, 962 F.3d at 1337 (quoting U.S. Const. art. III, § 2). "[W]hen the plaintiff is not himself the object of the government action … he challenges, standing is not precluded, but it is ordinarily substantially more difficult to establish." *Lujan*, 504 U.S. at 562 (internal quotation marks and quoted authority omitted).

A court must not "confuse weakness on the merits with absence of Article III standing." *Garcia-Bengochea v. Carnival Corp.*, 57 F.4th 916, 922 (11th Cir. 2022) (cleaned up). The "irreducible constitutional minimum of standing contains three elements." *Lujan*, 504 U.S. at 560. "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant,[14] and (3) that is likely to be redressed by a favorable judicial decision."[15] *Spokeo*, 578 U.S. at 338. Absent the three elements, a federal

---

[14]For traceability, "there must be a causal connection between the injury and the conduct complained of"; specifically, "the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560 (cleaned up). The burden of pleading traceability "is relatively modest." *Bennett v. Spear*, 520 U.S. 154, 171 (1997). Traceability does not equal proximate cause. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 n.6 (2014). "Even a showing that a plaintiff's injury is indirectly caused by a defendant's actions satisfies the traceability requirement." *Garcia-Bengochea*, 57 F.4th at 927 (cleaned up). Still, "the line of causation between the illegal conduct and injury [cannot be] too attenuated." *Allen v. Wright*, 468 U.S. 737, 752 (1984), *abrogated on other grounds by Lexmark*, 572 U.S. 118.

The Governor argues Mr. Johnson fails to allege facts showing traceability, contending, "Involvement of the Governor in any State general budgetary allocation involves no race-based governmental decision and no traceable injury." D73 at 10. This Court need not decide traceability because another jurisdictional ground for dismissal exists.

[15]For redressability, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan*, 540 U.S. at 561 (cleaned up). At the pleading stage, the plaintiff "must plausibly allege that a decision in his favor would significantly increase the likelihood that he would obtain relief that directly redresses the injury suffered." *Garcia-Bengochea*, 57 F.4th at 927 (cleaned up).

court's exercise of power "would be gratuitous and thus inconsistent with the Art. III limitation." *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 38 (1976).

The party invoking federal jurisdiction has the burden of establishing these elements. *Spokeo*, 578 U.S. at 338. When an action is at the pleading stage, "the plaintiff must clearly allege facts demonstrating each element." *Id.* (cleaned up). Because "standing is not dispensed in gross … a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Town of Chester v. Laroe Ests., Inc.*, 137 S. Ct. 1645, 1650 (2017) (internal quotation marks and quoted authority omitted). "[G]eneral factual allegations of injury resulting from the defendant's conduct may suffice[.]" *Lujan*, 504 U.S. at 561. But a court cannot "create jurisdiction by embellishing a deficient allegation of injury." *Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 925 (11th Cir. 2020) (en banc) (quoted authority omitted).

An injury in fact is the "first and foremost of standing's three elements," *Spokeo*, 578 U.S. at 338 (cleaned up), and, in the interest of judicial economy, the only one addressed here. An injury in fact is "an invasion of a legally protected interest" that is "concrete,"[16] "particularized," and "actual" or

---

The Governor argues Mr. Johnson fails to allege facts sufficient to show redressability, contending, "Plaintiff has not alleged how a declaration against the Governor's involvement in 'enacting' or signing into law future hypothetical general budgetary allocations for the presence, maintenance, preservation, and protection of confederate monuments or naming tributes redress his injuries. Such declarations against the Governor would not prevent passage of the State's budget." D73 at 14. This Court need not decide redressability because another jurisdictional ground for dismissal exists.

[16]To be concrete, an injury "must be de facto; that is, it must actually exist." *Spokeo*, 578 U.S. at 340 (cleaned up). "As a general matter, the [Supreme] Court has explained that history and tradition offer a meaningful guide to the types of cases that Article III empowers federal courts to consider." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021) (internal quotation marks and quoted authority omitted). For "the concrete-harm requirement in particular, … courts should assess whether the alleged

"imminent," not "conjectural" or "hypothetical."[17] *Lujan*, 504 U.S. at 560 (cleaned up).

Concreteness and particularity are distinct. *Spokeo*, 578 U.S. at 339–40. "For an injury to be particularized, it must affect the plaintiff in a personal and

---

injury to the plaintiff has a close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts." *Id.* (internal quotation marks and quoted authority omitted). "That inquiry asks whether plaintiffs have identified a close historical or common-law analogue for their asserted injury." *Id.*

"[C]ertain harms readily qualify as concrete injuries under Article III." *Id.* "The most obvious are traditional tangible harms, such as physical harms and monetary harms." *Id.* "Various intangible harms can also be concrete." *Id.* "Chief among them are injuries with a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts." *Id.* "Those include, for example, reputational harms, disclosure of private information, and intrusion upon seclusion." *Id.* "And those traditional harms may also include harms specified by the Constitution itself[,]" like "abridgment of free speech" and "infringement of free exercise." *Id.* But "purely psychic injuries arising from disagreement with government action—for instance, 'conscientious objection' and 'fear'—don't qualify." *Gardner*, 962 F.3d at 1341 (citing *Diamond v. Charles*, 476 U.S. 54, 67 (1986), and *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 417–18 (2013)).

"Stigmatic" injury is a "particular theory of injury." *Laufer v. Arpan LLC*, 29 F.4th 1268, 1274 n.5 (11th Cir. 2022). Under this theory, even without identifying a common-law comparator, a plaintiff may have a concrete injury for a violation of an anti-discrimination law if the plaintiff suffers illegal discrimination causing the plaintiff emotional injury like frustration, humiliation, or a sense of isolation or segregation. *Id.* at 1274.

The City argues Mr. Johnson fails to allege facts showing he suffered a concrete injury. D72 at 6. This Court need not decide concreteness because another jurisdictional ground for dismissal exists.

[17]"An allegation of future injury" might be actual and imminent "if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (internal quotation marks and quoted authority omitted). But "'some day' intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of the 'actual or imminent' injury[.]" *Lujan*, 504 U.S. at 564.

The Governor argues Mr. Johnson "fail[s] to allege any actual, justiciable case or controversy between adverse parties based on articulated facts that demonstrate a real threat of immediate injury[.]" D73 at 9. This Court need not decide actuality or imminency because another jurisdictional ground for dismissal exists.

individual way." *Id.* at 339 (cleaned up). The "test requires more than an injury to a cognizable interest"; the test "requires that the party seeking review be himself among the injured." *Lujan*, 504 U.S. at 563. "[W]hen the asserted harm is a generalized grievance shared in substantially equal measure by all or a large class of citizens, that harm alone normally does not warrant exercise of jurisdiction." *Warth*, 422 U.S. at 499 (internal quotation marks omitted). Still, "[t]hat an injury may be suffered by a large number of people does not of itself make that injury a nonjusticiable generalized grievance. The victims' injuries from a mass tort, for example, are widely shared, to be sure, but each individual suffers a particularized harm." *Spokeo*, 578 U.S. at 339 n.7.

Plaintiffs lack standing where they allege a constitutional violation but "fail to identify any personal injury suffered by them as a consequence of the alleged constitutional error, other than the psychological consequence presumably produced by observation of conduct with which one disagrees." *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 485 (1982). "That is not an injury sufficient to confer standing under Art. III, even though the disagreement is phrased in constitutional terms." *Id.* at 485–86. This is true even if the plaintiffs are "firmly committed to the constitutional principle" at issue; after all, "standing is not measured by the intensity of the litigant's interest or the fervor of his advocacy." *Id.* at 486.

Applying these principles, the Supreme Court has held a plaintiff lacked standing to challenge a club's racially discriminatory membership policies because he had not applied for membership in the club. *See Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 166–67 (1972). The Supreme Court has held plaintiffs lacked standing to challenge racial discrimination in the

administration of their city's criminal justice system because they had not alleged they had been or likely would be subjected to the practices. *See O'Shea v. Littleton*, 414 U.S. 488, 493–95 (1974). The Supreme Court has held plaintiffs lacked standing to challenge racial discrimination in their city's policing practices because they lacked a personal stake in the relief requested. *See Rizzo v. Goode*, 423 U.S. 362, 605 (1976). And the Supreme Court has held parents of black children attending public schools in districts undergoing desegregation lacked standing to challenge the Internal Revenue Service's failure to adopt standards and procedures to fulfill its obligation to deny tax-exempt status to racially discriminatory private schools because the children had not been personally denied equal treatment by the challenged discriminatory conduct. *See Allen v. Wright*, 468 U.S. 737, 752 (1984). In the latter case, the Court explained,

> If the abstract stigmatic injury were cognizable, standing would extend nationwide to all members of the particular racial groups against which the Government was alleged to be discriminating by its grant of a tax exemption to a racially discriminatory school, regardless of the location of that school. All such persons could claim the same sort of abstract stigmatic injury[.] … Recognition of standing in such circumstances would transform the federal courts into 'no more than a vehicle for the vindication of the value interests of concerned bystanders.' Constitutional limits on the role of the federal courts preclude such a transformation.

*Id.* at 755–56 (quoting *United States v. SCRAP*, 412 U.S. 669, 687 (1973)).

The Fifth and Eleventh Circuits have applied the particularized-injury requirement in two recent cases concerning Confederate monuments: *Gardner*, 962 F.3d 1329, and *McMahon v. Fenves*, 946 F.3d 266 (5th Cir. 2020). The interests of the plaintiffs in those cases starkly contrast with the interests of Mr. Johnson in this case, but the cases are instructive on the issue of whether

Mr. Johnson sufficiently alleges facts showing he has suffered a particularized injury necessary for standing.

In those cases, individuals and organizations sued to challenge specific government decisions to remove Confederate monuments from government property. *Gardner*, 962 F.3d at 1335; *McMahon*, 946 F.3d at 268–69. The individuals included descendants of Confederate soldiers. *Gardner*, 962 F.3d at 1334; *McMahon*, 946 F.3d at 268. The courts held the plaintiffs failed to allege facts sufficient to show they had suffered a particularized injury from alleged violations of their rights to free speech, and, in *Gardner*, the court also held the same regarding their rights to due process.[18] *Gardner*, 962 F.3d at 1342–43; *McMahon*, 946 F.3d at 270–72.

In *Gardner*, the Eleventh Circuit explained:

> [The plaintiffs] claim interests in "preserv[ing] the history of the south," "expressing their free speech[] from a Southern perspective," "'vindicat[ing] the cause' for which the Confederate Veteran fought," and "protect[ing] and preserv[ing] Memorials to American veterans." But those interests are "undifferentiated," collective—not "distinct" to any of the plaintiffs. …

> [A]side from their "special interest in the subject[s]" of Confederate history, veterans memorials, and the so-called "Southern perspective," … the plaintiffs haven't shown that they have suffered a particularized Article III injury of the sort that distinguishes them from other interested observers and thus qualifies them, specifically, to invoke federal-court jurisdiction. They don't allege, for example, that they (or, for the organizational plaintiffs, their members) routinely visited the monument in [the original park] or, alternatively, that they won't be able to visit the monument at its new location in Veterans Park.

---

[18]In *Gardner*, the Eleventh Circuit also held the plaintiffs had failed to allege facts sufficient to show they suffered a concrete injury. 962 F.3d at 1341; *accord Ladies Mem'l Ass'n v. City of Pensacola*, 34 F.4th 988, 992–93 (11th Cir. 2022) (holding plaintiffs challenging the removal of a Confederate monument failed to allege facts sufficient to show they had suffered a concrete injury).

> Rather, their allegations implicate only the generalized desires to promote Southern history and to honor Confederate soldiers. ... [T]hey haven't shown themselves—in particular—to be "among the injured," ... or ... that they are more than "concerned bystanders" attempting to vindicate their "value interests[.]"

*Id.* at 1342–43 (some alterations in original and all quoted authorities omitted). Turning to the due-process claim, the Eleventh Circuit ruled, "The same standing deficiencies that sunk the plaintiffs' [free-speech] claim ... doom their due process claim as well." *Id.* at 1343. The Eleventh Circuit added that the plaintiffs' interests "are simply too vague, inchoate, and undifferentiated to implicate Article III." *Id.*

On remand, the plaintiffs in *Gardner* remedied their deficient allegations by adding allegations that they visited the monument regularly, they had plans to visit the monument again, and the relocation obstructs their planned future use and enjoyment of the monument. *Gardner v. Mutz*, 857 F. App'x 633, 635 (11th Cir. 2021), *cert. denied*, 142 S. Ct. 762 (2022). Specifically, the plaintiffs alleged that "[m]ultiple organizational plaintiffs include members who visit the monument to pay their respects to those it memorializes"; "[t]he members intend to continue to gather, and their political speech is rendered less effective by the removal of the monument"; "[m]ultiple organizational plaintiffs include members who regularly gather at the monument to engage and educate the public"; "[o]ne plaintiff's ancestors collected donations for and erected the monument [and] honors the war dead at the monument and wishes to continue to do so"; "[o]ne plaintiff gathered at the monument when it was at the old park, and spoke there"; and "[m]ultiple plaintiffs publish literature about the monument." *Id.* at 634. The Eleventh Circuit explained the "injuries are ... particularized because they injure only

those people who regularly visit the monument and plan to do so in the near future, rather than the undifferentiated public." *Id.* at 635.

In *McMahon*, the Fifth Circuit explained the plaintiffs failed to show particularized injury to their right to free speech because although their ties to the monuments might give them "strong reasons to care about" them, they failed to explain how the ties gave them a free-speech-based stake in the litigation. 946 F.3d at 270. The court explained:

> Plaintiffs would of course prefer a world where the [defendants] display Plaintiffs' favored monuments. Plaintiffs provide reasons—presumably strong ones—for why they are more attached to the monuments' viewpoint than the general public is. But strong reasons are no better than weak ones at giving Plaintiffs a direct and personal stake in this litigation. To be sure, we do not doubt that Plaintiffs are offended by the removal of these monuments or that they feel this offense more acutely because of their familial ties. These ties, however, do not distinguish Plaintiffs from any other persons who might claim offense at the removal of these monuments. This is because these ties affect only the magnitude of Plaintiffs' indignation, not the nature of their injury. For Plaintiffs, their injury is the pain of believing that a certain expression of a viewpoint with which they agree has been unconstitutionally removed from public display. That is a generalized psychological injury, not a particularized free-speech one—it is felt by all who are offended by this removal. That Plaintiffs are more offended than someone who is likeminded yet lacks these ties does not make that generalized injury particularized. … Plaintiffs have shown only a rooting interest in the outcome of this litigation, not a direct and personal stake in it. They are in the same position as any enthusiastic onlooker.

*Id.* at 271–72.

The defendants here argue Mr. Johnson fails to allege facts showing any particularized injury. D72 at 5–6; D73 at 9, 12. The City contends the alleged injury is not unique to Mr. Johnson because "[a]nyone who opposes white supremacy would conceivably share" the feelings he describes. D72 at 6. The Governor contends, "Plaintiff's conclusory allegation that he has been injured

by or suffered from the Governor's conduct without alleging how he himself has been injured or suffered in a particular, personal, and individual way, separate or differentiated from others is too vague and abstract to implicate standing." D73 at 12.

As the defendants argue, Mr. Johnson fails to allege facts showing alleged violations of the laws have affected or will affect him in a personal and individual way. Instead, the injury he alleged he suffered or will suffer "is a generalized grievance shared in substantially equal measure by … a large class of citizens," *see Warth*, 422 U.S. at 499 (quoted), and at most a "psychological consequence … produced by observation of conduct [or meanings, actual or perceived] with which [he] disagrees," *see Valley Forge*, 454 U.S. at 485 (quoted).

Insufficient are Mr. Johnson's allegations that he is "African American (a Black person), the descendant of enslaved African Americans then-held in Confederate states"; he "has traveled through or visited most all of the public locations above-identified" in the last four years; and he "is deeply repulsed, disheartened, and intimidated by the governmental celebrations of White supremacy against him as a Black American." D63 ¶¶6, 15, 16. Unlike the plaintiffs in *Gardner* on remand, he fails to allege that he regularly visits any place or plans to regularly visit any place soon. *See generally* D63. Instead, like the plaintiffs in *Gardner* before remand, his alleged injuries "are simply too vague, inchoate, and undifferentiated to implicate Article III." *See Gardner*, 962 F.3d at 1343 (quoted).

Were the conclusion otherwise, any traveler in the Middle District of Florida offended by any Confederate-related street name, school name, or county name or by any Confederate-related memorial, monument, mural,

building, or program on government property "could claim the same sort of abstract stigmatic injury," which, if recognized as a particularized injury, would transform this Court "into 'no more than a vehicle for the vindication of the value interests of concerned bystanders.'" *See Allen*, 468 U.S. at 755–56 (quoting *SCRAP*, 412 U.S. at 687) (quoted).

Mr. Johnson's response to the City's standing argument supports that the harm he asserts is a generalized grievance. He writes, "[T]he protestations fly in the face of the … allegations of the discriminatory impacts government tributes to White supremacy through Confederate monuments that were placed as beacons to the ideal that Black people (i.e. Plaintiff) are not equal to White people, have lesser humanity and that enslavement to the superior race is the natural and normal state of Black people. As a Black person, Confederate monuments and tributes on public land, supported by tax dollars, are a bigoted attack based upon race – endorsed by the state. If tributes to the Confederacy on public land is not a 'badge' of slavery, what can be?" D76 at 13.

Thus, at a minimum, Mr. Johnson fails to allege facts showing he has suffered or will suffer a personalized injury required for ordinary standing.

d.   <u>Taxpayer Standing</u>

Taxpayer standing differs from ordinary standing. *Nat'l All. for Mentally Ill, St. Johns Inc. v. Bd. of Cnty. Comm'rs of St. Johns Cnty.*, 376 F.3d 1292, 1294 (11th Cir. 2004). Taxpayer standing derives from *Crampton v. Zabriskie*, 101 U.S. 601 (1879), a case decided more than a century ago. In *Crampton*, county-resident taxpayers demanded equitable relief relating to the county's issuance of bonds to buy land for a courthouse. 101 U.S. at 607–08. Holding the taxpayers had standing, the Supreme Court observed that "no serious

question" exists regarding "the right of resident tax-payers to invoke the interposition of a court of equity to prevent an illegal disposition of the moneys of the county or the illegal creation of a debt which they in common with other property-holders of the county may otherwise be compelled to pay." *Id.* at 609.

More than a half-century later, in *Frothingham v. Mellon*, the Supreme Court established the general rule that standing cannot be based on mere taxpayer status.[19] 262 U.S. 447, 486 (1923). The Court distinguished *Crampton* by distinguishing municipalities from other forms of government, explaining "resident taxpayers may sue to enjoin an illegal use of the moneys of a

---

[19]In *Flast v. Cohen*, 392 U.S. 83 (1986), the Supreme Court allowed standing based on mere taxpayer status—apart from municipal-taxpayer standing—on an "extremely limited" basis. *Korioth v. Brisco*, 523 F.2d 1271, 1277 (5th Cir. 1975). In *Flast*, the Supreme Court held individuals paying federal taxes had standing to challenge under the Establishment Clause a federal spending program under the Spending Clause. 392 U.S. at 102–03. The Court stated, "[A] taxpayer will have standing … when he alleges that congressional action under the taxing and spending clause is in derogation of those constitutional provisions which operate to restrict the exercise of the taxing and spending power." *Id.* at 105–06.

The Supreme Court has repeatedly distinguished *Flast* to find an absence of standing. *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 347–49 (2006); *Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 138–46 (2011); *Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587, 602–15 (2007) (plurality); *Valley Forge*, 454 U.S. at 478–90; *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 215–28 (1974); *United States v. Richardson*, 418 U.S. 166, 174–80 (1974). *But see Marsh v. Chambers*, 463 U.S. 783, 786 n.4 (1983) (stating without elaboration that the plaintiff—a member of the state legislature and a state taxpayer—had standing to challenge the state legislature's opening of each session with a prayer by a chaplain paid with public funds).

The Eleventh Circuit has stated that *Flast* "pertains only to *federal* taxpayers and does not apply to municipal taxpayers." *Pelphrey v. Cobb Cnty.*, 547 F.3d 1263, 1280 (11th Cir. 2008). *But see Women's Emer. Network v. Bush,* 323 F.3d 937, 943 (11th Cir. 2003) (applying *Flast* to determine if county taxpayers had standing); *Korioth*, 523 at 1277 n.16 ("We find it unnecessary to parse out in detail the different claims which might be raised … as a federal, state, and local taxpayer. To have standing in regard to any of them, [the plaintiff] must either meet the narrow *Flast* criteria … or allege the type of injury in fact which would give rise to standing generally."). Without a federal-taxpayer allegation or an Establishment Clause claim, analyzing whether *Flast* applies here is unnecessary.

municipal corporation" and "the remedy by injunction to prevent their misuse is not inappropriate" because "[t]he interest of a taxpayer of a municipality in the application of its moneys is direct and immediate." *Id.* The Court elaborated: "The reasons [for extending] the equitable remedy to a single taxpayer … are based upon the peculiar relation of the corporate taxpayer to the corporation, which is not without some resemblance to that subsisting between stockholder and private corporation." *Id.* at 487.

Decades later, the Supreme Court in *Doremus v. Board of Education of Hawthorne* observed that *Frothingham* "recognized … that '[t]he interest of a taxpayer of a municipality in the application of its moneys is direct and immediate and the remedy by injunction to prevent their misuse is not inappropriate.'" 342 U.S. 429, 433–34 (1952) (quoting *Frothingham*, 262 U.S. at 486). The Court added,

> Without disparaging the availability of the remedy by taxpayer's action to restrain unconstitutional acts which result in direct pecuniary injury, we reiterate what the Court said of a federal statute as equally true when a state Act is assailed: The party who invokes the power must be able to show, not only that the statute is invalid, but that he has sustained or is immediately in danger of sustaining some direct injury as a result of its enforcement, and not merely that he suffers in some indefinite way in common with people generally.

*Id.* at 434 (internal quotation marks and quoted authority omitted). The Court distinguished a case in which the Court "found a justiciable controversy" by explaining the plaintiff in that case had "show[n] a measurable appropriation or disbursement of … funds occasioned solely by the activities complained of." *Id.* The Court concluded, "The taxpayer's action" can satisfy the case-or-controversy requirement "only when it is a good-faith pocketbook action." *Id.*

From the "measurable" language in *Doremus*, courts have ruled a plaintiff must show a measurable or more than de minimus appropriation or loss of revenue to show municipal-taxpayer standing. *See, e.g.*, *ACLU-NJ v. Twp. of Wall*, 246 F.3d 258, 264 (3d Cir. 2001); *Doe v. Madison Sch. Dist. No. 321*, 177 F.3d 789, 794 (9th Cir. 1999); *United States v. City of New York*, 972 F.2d 464, 470–71 (2d Cir. 1992); *D.C. Common Cause v. District of Columbia*, 858 F.2d 1, 4–5 (D.C. Cir. 1988).

More recently, in *ASARCO Inc. v. Kadish*, the Supreme Court summarized taxpayer standing jurisprudence in the context of federal taxpayers, state taxpayers, and municipal taxpayers:

> The question whether taxpayers or citizens have a sufficient personal stake to challenge laws of general application where their own injury is not distinct from that suffered in general by other taxpayers or citizens covers old and familiar ground. As an ordinary matter, suits premised on federal taxpayer status are not cognizable in the federal courts because a taxpayer's interest in the moneys of the Treasury is shared with millions of others, is comparatively minute and indeterminable; and the effect upon future taxation, of any payments out of the funds, so remote, fluctuating and uncertain, that no basis is afforded for judicial intervention.
>
> We have indicated that the same conclusion may not hold for municipal taxpayers, if it has been shown that the peculiar relation of the corporate taxpayer to the municipal corporation makes the taxpayer's interest in the application of municipal revenues direct and immediate. Yet we have likened state taxpayers to federal taxpayers, and thus we have refused to confer standing upon a state taxpayer absent a showing of direct injury, pecuniary or otherwise.

490 U.S. 605, 613–14 (1989) (cleaned up). And in *DaimlerChrysler Corp. v. Cuno*, the Court observed, "The *Frothingham* Court noted with approval the standing of municipal residents to enjoin the 'illegal use of the moneys of a municipal corporation,' relying on 'the peculiar relation of the corporate

taxpayer to the corporation' to distinguish such a case from the general bar on taxpayer suits." 547 U.S. 332, 349 (2006).

In *Pelphrey v. Cobb County*, the Eleventh Circuit cited *DaimlerChrysler* and stated, "The standing of municipal taxpayers to challenge, as unconstitutional, expenditures by local governments remains settled law."[20] 547 F.3d 1263, 1280 (11th Cir. 2008). The Eleventh Circuit held county taxpayers had municipal-taxpayer standing to challenge a discontinued practice of selecting invocational speakers for county meetings, upheld a ruling that the practice had violated the Establishment Clause, and affirmed a nominal-damages award. *Id.* at 1279–82. Quoting *Frothingham*, the Eleventh Circuit explained the plaintiffs had "established the 'direct and immediate' interest necessary to confer standing" because the record established that, during the time in question, they had been county residents and the county

---

[20]Some courts have questioned why the municipal-taxpayer doctrine continues to govern in the face of changing times and changing standing jurisprudence. *See, e.g.*, *Protect Our Parks, Inc. v. Chi. Park Dist.*, 971 F.3d 722, 733 (7th Cir. 2020) ("Municipal taxpayer standing is a bit of a relic in the modern landscape of standing. … The rule remains undisturbed, but it has grown increasingly anomalous. [The Supreme Court] has developed a substantial body of law vigorously enforcing the principle that injuries cognizable under Article III cannot be 'generalized,' 'undifferentiated,' or insufficiently 'particularized.' It has also repeatedly emphasized that neither state nor federal taxpayers can satisfy this standard in a suit against the government for the illegal expenditure of taxpayer funds. … *Frothingham* suggested that the city or county resident has a 'peculiar relationship' with her local government, while the state or federal citizen has only a 'minute' or 'remote' tie to hers. Maybe that's true in Grover's Corners. But why is a suit brought by one of Chicago's 2.6 million residents any more particularized than a suit by any of the 579,000 citizens of Wyoming?" (internal citations omitted)); *Smith v. Jefferson Cnty. Bd. of Sch. Comm'rs*, 641 F.3d 197, 221 (6th Cir. 2011) (en banc) (Sutton, J., concurring) (explaining the "tension between the municipal-taxpayer-standing doctrine and modern standing principles"). Addressing whether the municipal-taxpayer doctrine should continue to govern is unnecessary because binding precedent applies.

had expended public funds to select, invite, and thank the invocational speakers. *Id.* at 1281.

Courts have recognized that "[a] plaintiff's status as a municipal taxpayer is irrelevant for standing purposes if no tax money is spent on the allegedly unconstitutional activity." *Am. Humanist Ass'n v. Douglas Cnty. Sch. Dist. RE-1*, 859 F.3d 1243, 1259 (10th Cir. 2017) (quoted authority omitted). Thus, for example, a court found no municipal-taxpayer standing to challenge as unconstitutional a display on public property because no evidence suggested the county had used tax money for the challenged display as opposed to money from other sources of revenue, like licensing fees, contracts, or donations. *Woodring v. Jackson Cnty.*, 986 F.3d 979, 984–85 (7th Cir. 2021). In another case, the court found likewise, observing nearly a third of the city's budget came from non-tax sources and explaining, "It is not enough to simply allege that the City is spending money; the existence of municipal taxpayer standing depends on where the money comes from." *Protect Our Parks, Inc. v. Chi. Park Dist.*, 971 F.3d 722, 735 (7th Cir. 2020). And in another case, the court ruled likewise where funds to maintain park areas around a challenged display would be incurred with or without the display there. *Gonzales v. N. Twp. of Lake Cnty.*, 4 F.3d 1412, 1416 (7th Cir. 1993).

The defendants here argue Mr. Johnson fails to allege facts showing taxpayer standing. D72 at 8–9; D73 at 12–13. They are correct. The Court struck the original complaint in part because Mr. Johnson had alleged "no facts regarding the nature of the 'general budgetary allocations,' merely alleging they 'inure' to the 'presence, maintenance, preservation, and protection' of Confederate monuments and tributes." D58 at 15. The Court observed, "How

the allocations specifically affect the monuments and tributes or how his local or state taxes are used in those allocations is not alleged." *Id.*

The omission remains. In the second amended complaint, Mr. Johnson alleges he pays local and state taxes. *See* D63 ¶6. He alleges the specified monuments and "naming tributes" are on "tax-funded public land." *Id.* ¶14. And he alleges the defendants "enact general budgetary allocations inuring to the presence, maintenance, preservation and protection of" the complained-of "monuments and/or naming tributes … through public tax-based funding." *Id.* ¶20. These vague allegations are insufficient. For the claims against the Governor in particular, Mr. Johnson fails to allege facts showing any "direct" injury to him based on his payment of unspecified state taxes. *See ASARCO*, 490 U.S. at 614 (quoted). For the claims against the City in particular, Mr. Johnson fails to allege facts showing any use—measurable or otherwise—of city taxpayer funds to benefit the things or places in the City he identifies in the second amended complaint. *See generally* D63. His allegations are distinct from the facts in *Pelphrey* showing the plaintiffs were county residents during the time in question and the county had expended public funds to select, invite, and thank challenged invocational speakers.[21] *See Pelphrey*, 547 F.3d at 1281.

---

[21]Mr. Johnson's allegations also are distinct from allegations in another case recently decided by this Court. In that case, the Court found the plaintiffs sufficiently alleged facts for municipal-taxpayer standing to challenge the City of St. Augustine's removal and relocation of a Confederate monument. *See* the report and recommendation entered on January 31, 2023, at D67 and the order adopting the report and recommendation entered on March 20, 2023, at D72 in *Edgerton et al. v. City of St. Augustine*, No. 3:20-cv-941-BJD-PDB. There, the plaintiffs alleged at least one of them "is a resident taxpayer of the City and has lived there for five years," a "contractor [had] arrived on site with heavy equipment to begin removing the Monument," the "contractor engaged by the City, after having severed the historic structure and removed it from the Plaza, began transporting the decapitated structure by truck and then by barge to its new location," and "[t]he cost of the relocation of the Monument to private property was paid for by the City of St. Augustine with municipal taxpayer dollars." Report and Recommendation at 13, 14, 73–74 (quoting from the operative complaint in that case).

Reading his pleading to fill in the blanks with guesswork would result in impermissible embellishment of a deficient allegation of injury. *See Muransky*, 979 F.3d at 924.

Mr. Johnson argues his pleading "clearly alleges that [his] injuries are different from those suffered by taxpayers in general" because he "claims to be 'African American (a Black person), the descendant of enslaved African Americans then-held in Confederate states, and a payor of local and state taxes within the jurisdiction'" and alleges "the Confederacy was founded on principles of White supremacy over Black Americans, that the jurisdiction is filled with tax-supported Confederate tributes on public land, that [he] is deeply repulsed, disheartened and intimidated by monuments and naming tributes as they are declarations of [his] sub-humanity and second-class citizen status due to race[.]'" D76 at 11 (quoting D63 ¶6); D79 at 7–8 (quoting D63 ¶6). These allegations fail to show that Mr. Johnson has sustained or is in immediate danger of sustaining a direct injury. These allegations also fail to show that either defendant has used taxes he has paid—much less measurably so—for the alleged unconstitutional activity about which he complains.

Because Mr. Johnson fails to allege facts sufficient to establish ordinary or taxpayer standing, this Court lacks subject-matter jurisdiction, and dismissal is warranted.[22] While standing is not dispensed with in gross, this

There, unlike here, the plaintiffs alleged facts about the specific use of municipal-taxpayer funds.

[22]The Eleventh Amendment to the United States Constitution provides, "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. This language effects sovereign immunity, which "is the privilege of the sovereign not to be

analysis applies to all of Mr. Johnson's claims, which essentially mirror each other and suffer the same omissions.

Both defendants ask the Court to dismiss the action with prejudice for lack of subject-matter jurisdiction. D72 at 10, 20; D73 at 15, 23. A dismissal for lack of jurisdiction is not a judgment on the merits and must be entered

---

sued without its consent." *Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 253 (2011).

"Although the express language of the amendment does not bar suits against a state by its own citizens, the Supreme Court has held that an unconsenting state is immune from lawsuits brought in federal court by the state's own citizens." *Carr v. City of Florence*, 916 F.2d 1521, 1524 (11th Cir. 1990). In most cases, without congressional abrogation of the immunity or a state's consent, the immunity bars private suits against states in federal court. *Id.* "Lawsuits against a state official in his or her official capacity are suits against the state when the state is the real, substantial party in interest." *Id.* (internal quotation marks and quoted authority omitted).

The *Ex parte Young* exception to Eleventh Amendment sovereign immunity is a legal fiction that allows private parties to bring suits for injunctive or declaratory relief against individual state officials acting in violation of federal law. *Al. v. PCI Gaming Auth.*, 801 F.3d 1278, 1288 (11th Cir. 2015). For the exception to apply, the state official, "by virtue of his office," must have "some connection with the enforcement of the [challenged] act, or else [the suit] is merely making him a party as a representative of the state, and thereby attempting to make the state a party." *Ex parte Young*, 209 U.S. 123, 157 (2015). The text of the challenged law need not actually state the official's duty to enforce it, but such a statement may make that duty clearer. *Id.* The inquiry into whether the exception applies does not require an analysis of the merits of the claim. *Verizon Md., Inc. v. Pub. Serv. Comm'n*, 535 U.S. 635, 646 (2002). Instead, "a court need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Id.* at 645 (cleaned up). A "narrow" exception to *Ex parte Young* exists for suits implicating "special sovereignty interests." *Curling v. Raffensperger*, 50 F.4th 1114, 1121 n.3 (11th Cir. 2022).

"Sovereign immunity is jurisdictional in nature." *FDIC v. Meyer*, 510 U.S. 471, 475 (1994). Dismissal based on sovereign immunity thus is without prejudice, not with prejudice. *Merchant v. U.S. Dep't of Educ. Off. of C.R. Atlanta Div.*, No. 21-13712, 2022 WL 15561847, at *3 (11th Cir. Oct. 28, 2022).

With little analysis, the Governor argues the suit against him is barred by the Eleventh Amendment. D73 at 22–23. Mr. Johnson disagrees. D79 at 19–20. This Court need not decide whether the Eleventh Amendment applies because another jurisdictional ground for dismissal exists.

without prejudice. *Stalley ex rel. U.S. v. Orlando Reg'l Healthcare Sys., Inc.*, 524 F.3d 1229, 1232 (11th Cir. 2008). Because dismissal would not a judgment on the merits, the dismissal must be without prejudice.

The absence of subject-matter jurisdiction ends the action. If the recommendation is adopted, deciding whether Mr. Johnson states a claim on which relief may be granted is unnecessary, and the following alternative recommendations can be disregarded.

2.    *Statement of a Claim on Which Relief Can Be Granted*

a.    <u>Standards</u>

A party can move to dismiss an action for failure to state a claim on which relief can be granted. Fed. R. Civ. P. 12(b)(6). When deciding a motion to dismiss on this ground, a court accepts the factual allegations in the complaint as true. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). The court also makes reasonable inferences in the light most favorable to the non-movant. *MSP Recovery Claims, Series LLC v. Metro. Gen. Ins. Co.*, 40 F.4th 1295, 1302 (11th Cir. 2022). "Unless the dismissal order states otherwise," a dismissal for failure to state a claim on which relief can be granted "operates as an adjudication on the merits." Fed. R. Civ. P. 41(b).

The United States Supreme Court explained the pleading standard in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). The standard does not require detailed factual allegations but requires "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678. A complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on

its face." *Twombly*, 550 U.S. at 570. A claim is plausible on its face if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Plausibility differs from probability, "but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* Labels, conclusions, formulaic recitations of the elements, and "naked assertions devoid of further factual enhancement" are insufficient. *Id.* (cleaned up). The pleading rule "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Id.* at 678–79.

b.    Claims

i.    *Title II*

For count I, Mr. Johnson relies on § 201 of Title II, codified at 42 U.S.C. § 2000a. D63 ¶¶24, 25. As stated, the statute provides, "All persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation, as defined in this section, without discrimination or segregation on the ground of race[.]" 42 U.S.C. § 2000a(a). Section 201 specifies that "[e]ach of the following establishments which serves the public is a place of public accommodation … if its operations affect commerce, or if discrimination or segregation by it is supported by State action":[23]

> (1) any inn, hotel, motel, or other establishment which provides lodging
> to  transient  guests,  other  than  an  establishment  located  within  a

---

[23]Under § 201, "Discrimination or segregation by an establishment is supported by State action" if "such discrimination or segregation (1) is carried on under color of any law, statute, ordinance, or regulation; or (2) is carried on under color of any custom or usage required or enforced by officials of the State or political subdivision thereof; or (3) is required by action of the State or political subdivision thereof." 42 U.S.C. § 2000a(d).

building which contains not more than five rooms for rent or hire and which is actually occupied by the proprietor of such establishment as his residence;

(2) any restaurant, cafeteria, lunchroom, lunch counter, soda fountain, or other facility principally engaged in selling food for consumption on the premises, including, but not limited to, any such facility located on the premises of any retail establishment; or any gasoline station;

(3) any motion picture house, theater, concert hall, sports arena, stadium or other place of exhibition or entertainment; and

(4) any establishment (A)(i) which is physically located within the premises of any establishment otherwise covered by this subsection, or (ii) within the premises of which is physically located any such covered establishment, and (B) which holds itself out as serving patrons of such covered establishment.

42 U.S.C. § 2000a(b). "The operations of an establishment affect commerce … if":

(1) it is one of the establishments described in paragraph (1) of subsection (b); (2) in the case of an establishment described in paragraph (2) of subsection (b), it serves or offers to serve interstate travelers of a substantial portion of the food which it serves, or gasoline or other products which it sells, has moved in commerce; (3) in the case of an establishment described in paragraph (3) of subsection (b), it customarily presents films, performances, athletic teams, exhibitions, or other sources of entertainment which move in commerce; and (4) in the case of an establishment described in paragraph (4) of subsection (b), it is physically located within the premises of, or there is physically located within its premises, an establishment the operations of which affect commerce within the meaning of this subsection. For purposes of this section, "commerce" means travel, trade, traffic, commerce, transportation, or communication among the several States, or between the District of Columbia and any State, or between any foreign country or any territory or possession and any State or the District of Columbia, or between points in the same State but through any other State or the District of Columbia or a foreign country.

*Id.* § 2000a(c).

The language in § 201 "must be read with open minds attuned to the clear and strong purpose of the [Civil Rights Act of 1964], namely, to secure for all citizens the full enjoyment of facilities described in the Act which are open to the general public." *Rousseve v. Shape Spa for Health & Beauty, Inc.*, 516 F.2d 64, 67 (5th Cir. 1975) (internal quotation marks and quoted authority omitted). Thus, for example, an amusement park is a "place of entertainment" because the language in § 201 includes "both establishments which present shows, performances and exhibitions to a passive audience and those establishments which provide recreational or other activities for the amusement or enjoyment of its patrons." *Miller v. Amusement Enters., Inc.*, 394 F.2d 342, 350 (5th Cir. 1968). Still, the Act is "not intended to cover all establishments." *Rousseve*, 516 F.2d at 67.

Section 202 of Title II, codified at 42 U.S.C. § 2000a-1, provides, "All persons shall be entitled to be free, at any establishment or place, from discrimination or segregation of any kind on the ground of race … if such discrimination or segregation is or purports to be required by any law, statute, ordinance, regulation, rule, or order of a State or any agency or political subdivision thereof."

Section 203 of Title II, codified at 42 U.S.C. § 2000a-2, prohibits interference with the rights in § 201 and § 202: "No person shall (a) withhold, deny, or attempt to withhold or deny, or deprive or attempt to deprive any person of any right or privilege secured by [§ 201 and § 202], or (b) intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person with the purpose of interfering with any right or privilege secured by [§ 201 and § 202.]" 42 U.S.C. § 2000a-2.

Section 204 of Title II, codified at 42 U.S.C. § 2000a-3, provides a private cause of action for preventative relief for a violation of § 203: "Whenever any person has engaged or there are reasonable grounds to believe that any person is about to engage in any act or practice prohibited by [§ 203], a civil action for preventive relief, including an application for a permanent or temporary injunction, restraining order, or other order, may be instituted by the person aggrieved[.]"[24] 42 U.S.C. § 2000a-3(a). Relatedly, § 207, codified at 42 U.S.C.

---

[24]Section 204 includes a notice requirement:

In the case of an alleged act or practice prohibited by this subchapter which occurs in a State, or political subdivision of a State, which has a State or local law prohibiting such act or practice and establishing or authorizing a State or local authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof, no civil action may be brought under subsection (a) before the expiration of thirty days after written notice of such alleged act or practice has been given to the appropriate State or local authority by registered mail or in person, provided that the court may stay proceedings in such civil action pending the termination of State or local enforcement proceedings.

42 U.S.C. § 2000a-3(c); *accord Strober v. Payless Rental Car*, 701 F. App'x 911, 912–13, 913 n.3 (11th Cir. 2017) (observing the Title II plaintiff had failed to exhaust available Florida administrative remedies).

Section 207 provides, "The district courts of the United States shall have jurisdiction of proceedings instituted pursuant to this subchapter and shall exercise the same without regard to whether the aggrieved party shall have exhausted any administrative or other remedies that may be provided by law." *Id.* § 2000a-6(a). The notice requirement is not jurisdictional. *Peters v. Cheval Golf & Athletic Club, LLC*, No. 8:20-CV-2080-KKM-AAS, 2022 WL 88197, at *3 (M.D. Fla. Jan. 7, 2022); *Zinman v. Nova Se. Univ., Inc.*, No. 21-CV-60723-RUIZ-STRAUSS, 2021 WL 4025722, at *5 (S.D. Fla. Aug. 30, 2021), *report and recommendation adopted sub nom. Zinman v. Nova Se. Univ.*, No. 21-CIV-60723-RAR, 2021 WL 4226028 (S.D. Fla. Sept. 15, 2021). Although courts in some cases outside the Eleventh Circuit have held the notice requirement is jurisdictional, *see, e.g.*, *Stearnes v. Baur's Opera House, Inc.*, 3 F.3d 1142, 1144 (7th Cir. 1993), the cases are not persuasive because they pre-date jurisprudence on the distinction between jurisdictional limitations and claims-processing rules supporting that the notice requirement is a claims-processing rule. *See Definitive Marine Survs. Inc. v. Tran*, 339 F. Supp. 3d 1292, 1298–1308 (M.D. Fla. 2018) (surveying Supreme Court precedent on the distinction between jurisdictional limitations and claims-processing rules).

For his Title II claim, Mr. Johnson contends he "exhausted all conditions perquisite [sic]" without elaborating. *See* D63 ¶33. Neither defendant argues dismissal

§ 2000a-6, provides, "The remedies provided in this subchapter shall be the exclusive means of enforcing the rights based on this subchapter[.]" 42 U.S.C. § 2000a-6(b); *see also Newman v. Piggie Park Enters., Inc.*, 390 U.S. 400, 402, (1968) ("When a plaintiff brings an action under [Title II], he cannot recover damages.").[25]

Courts interpreting Title II hold the law requires more than a showing that the defendant displayed something offensive to patrons or would-be patrons. *See, e.g.*, *Joseph v. Metro. Museum of Art*, 684 F. App'x 16, 17 (2d Cir.

---

of Mr. Johnson's Title II claim is warranted because he failed to provide notice or filed this action too late. *See generally* D72, D73. This Court need not address the notice requirement because the requirement is not jurisdictional, the defendants do not raise the requirement as an issue, and a jurisdictional ground for dismissal exists.

[25]Mr. Johnson says he "travels under" § 1983, even for his Title II claim. *See* D63 ¶24. Unlike constitutional rights, not all federal statutes are enforceable under § 1983. *See, e.g.*, *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 120–21 (2005) (Telecommunications Act is not); *Gonzaga Univ. v. Doe*, 536 U.S. 273, 287 (2002) (Family Educational Rights and Privacy Act is not); *Suter v. Artist M.*, 503 U.S. 347, 363 (1992) (Adoption Assistance and Child Welfare Act is not). For a federal statute to be enforceable under § 1983, a "plaintiff must assert the violation of a federal right," not merely a violation of federal law. *Golden State Transit Corp. v. City of L.A.*, 493 U.S. 103, 106 (1989). A federal statute is not enforceable under § 1983 if it (1) does not unambiguously create a federal right in the plaintiffs, or (2) contains enforcement remedies intended by Congress to be the exclusive means of enforcement. *Gonzaga*, 536 U.S. at 280–81; *Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 20 (1981).

In *Adickes v. S. H. Kress & Co.*, the Supreme Court stated, "It is very doubtful" that a violation of rights under Title II "could properly serve as a basis for recovery under [§] 1983." 398 U.S. 144, 150 n.5 (1970). The Court explained, "Congress deliberately provided no damages remedy" in Title II and included in Title II express language that injunctive relief is "the 'exclusive means of enforcing the rights based on this title.'" *Id.* (quoting 42 U.S.C. § 2000a-6(b)). The Court continued, "Moreover, the legislative history makes quite plain that Congress did not intend that violations of [Title II] be enforced through the damages provisions of [§] 1983." *Id.*

Why Mr. Johnson says he "travels under" § 1983 for the Title II claim is unclear considering he demands only declaratory relief. Applying the rationale in *Adickes*, the undersigned analyzes Mr. Johnson's Title II claim directly under Title II, not indirectly under § 1983.

2017) (upholding judgment for a museum on a Title II claim by a plaintiff contending the museum's display of paintings depicting Jesus as white was discriminatory; the plaintiff failed "to allege *any* denial of access or different treatment than other visitors, which is required to sustain a Title II claim"); *Am. Italian Women for Greater New Haven v. City of New Haven*, No. 3:21-CV-01401 (JCH), 2022 WL 1912853, at *6 (D. Conn. June 3, 2022) (holding—in a case challenging the City of New Haven's decision to remove from a public square a statue of Christopher Columbus gifted by Italian immigrants—that an organization's Title II claim failed because its members took issue only with the content displayed in the square, not denial of access to the square); *Coleman v. Miller*, 885 F. Supp. 1561, 1571 (N.D. Ga. 1995) ("Plaintiff concedes that he was not actively denied access to any public facilities, but claims the [Confederate] flag's presence intimidated him into foregoing the use of certain unspecified public accommodations. Plaintiff presents no legal support for this theory and the court has found none.").

Mr. Johnson fails to state a Title II claim for at least two reasons argued by the defendants. *See* D72 at 10–13; D73 at 17.

First, Mr. Johnson fails to plead facts suggesting that anything about which he complains—whether a name or otherwise—is a place of public accommodation. He merely lists names, places, and objects as examples and makes the conclusory statement, "Counties, county census divisions, schools, school districts, roads, streets, drives, cemeteries, courthouses, government buildings and parks are places of public accommodation under the meaning of [Title II], as their operations affect commence [sic] pursuant to [Title II]." D63 ¶26. In other words, Mr. Johnson presents "naked assertions devoid of further

factual enhancement" insufficient to state a plausible claim. *See Iqbal*, 556 U.S. at 678 (quoted).

Second, Mr. Johnson fails to allege facts suggesting the defendants took any action that would constitute a Title II violation, such as denying him access based on his race or treating him differently from other patrons or would-be patrons based on his race. *See generally* D63. To the contrary, he admits he has visited most of the places he describes. *See* D63 ¶¶ 14, 15. As the City observes, he fails to allege "that anything is interfering with [his] ability to access the facilities he mentions."[26] D72 at 10. And as the Governor observes, "his

---

[26]To its argument that Mr. Johnson fails to allege interference with his ability to access the places he mentions in his pleading, the City adds:

> It bears mentioning that Mr. Johnson claims in Count I that the conduct of the City is not rationally related to a legitimate purpose. The same claim is repeated in each count. These allegations are implausible. To the contrary, many plausible rational reasons could justify maintaining street signs, or maintaining parks that happen to contain monuments which Plaintiff finds unpleasant. For example, the City has a non-delegable duty to maintain its properties so that dangerous conditions do not exist. The City could plausibly be reluctant to change street names because of inconvenience for those who own property on those streets whose addresses would change. Regarding the pedestal in James Weldon Johnson Park from which the statue of the Confederate soldier was removed by the City, Plaintiff sees the pedestal as a painful reminder of a tribute to the Confederacy. Others may see it as a symbol of hope, that where once there was a tribute to the Confederacy there now exists a statement that the City no longer agrees with the ideology that erected the tribute. And for all of the things about which Plaintiff complains, that they still exist could rationally be related to a concern about the expense of removal and a desire to achieve community consensus about them. Moreover, what is to be accomplished should the Plaintiff succeed? Taken literally, from the Plaintiff's allegations, the City could not replace a street sign after it had been stolen or knocked down in an accident. Is the City supposed to stop mowing the grass in Springfield Park? Must the City stop maintaining the area where the pedestal in the former Hemming Plaza sits—at risk of tort law premises liability?

D72 at 11–12 (internal citations omitted). This Court need not decide whether the asserted rational basis precludes recovery because other grounds for dismissal exist.

allegations only suggest he had and has free use." D73 at 17. Notwithstanding his argument to the contrary, *see* D76 at 8; D79 at 13, that particular names or adornments lessen his enjoyment of the places does not suffice to state a Title II claim.

Although Mr. Johnson does not reference § 202 of Title II (42 U.S.C. § 2000a-1) in his pleading, *see generally* D63, he now contends, "[W]here a state or local law discriminates based upon race or color in any place, it is a violation of Section 202[.]" D76 at 10; D79 at 15. Relying on *Robertson v. Johnston*, 376 F.2d 43 (5th Cir. 1967), he argues he need not point to a specific ordinance or law to proceed under § 202 because a government custom suffices. D76 at 10; D79 at 15–16.

In *Robertson*, the former Fifth Circuit held a white woman stated a claim under § 202 based on her allegation that her arrest for vagrancy while in a nightclub had been done to enforce a city's custom or usage to forbid or discourage white women from frequenting places with predominantly black patrons. 376 F.2d at 45. The Court explained, "In the context that the words 'custom and usage' are alleged, they would have or purport to have, if proven, the force of a law, ordinance, regulation, rule or order of the [city], which, in view of the comprehensive objectives of the [Civil Rights Act of 1964], we hold the language of [§ 202] sufficiently broad to cover." *Id.*

*Robertson* does not help Mr. Johnson.[27] Mr. Johnson not only fails to point to any particular "law, statute, ordinance, regulation, rule, or order," he

---

[27]That Mr. Johnson failed to reference § 202 in his pleading does not preclude consideration of that provision. In *Robertson*, the former Fifth Circuit explained, "We see no reason why we should make what we think would be an erroneous decision, because

also fails to point to any equivalent policy or custom requiring or purporting to require "discrimination or segregation of any kind on the ground of race" at "any establishment or place[.]" *See* 42 U.S.C. § 2000a-1 (quoted). Absent a specifically identified law, statute, ordinance, regulation, rule, order, policy, or custom, Mr. Johnson cannot state a claim based on § 202.

Thus, Mr. Johnson fails to state a Title II claim.

ii.   <u>*Thirteenth Amendment*</u>

For count II, Mr. Johnson relies on § 1983 and the Thirteenth Amendment. D63 ¶36. As stated, the amendment provides, "Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction." U.S. Const. amend. XIII, § 1. The amendment further provides, "Congress shall have power to enforce this article by appropriate legislation." *Id.* § 2.

"The primary purpose of the [Thirteenth] Amendment was to abolish the institution of African slavery as it had existed in the United States at the time of the Civil War, but the Amendment was not limited to that purpose; the phrase 'involuntary servitude' was intended to extend to cover those forms of compulsory labor akin to African slavery which in practical operation would tend to produce like undesirable results." *United States v. Kozminski*, 487 U.S. 931, 942 (1988) (internal quotation marks and quoted authority omitted). "The Amendment is self-executing without any ancillary legislation, so far as its

---

the applicable law [(§ 202)] was not insisted upon by one of the parties." *Robertson*, 376 F.2d at 44 (quoted authority omitted).

terms are applicable to any existing state of circumstances[.]" *Id.* (internal quotation marks and quoted authority omitted).

In *N.A.A.C.P. v. Hunt*—a case on which both defendants rely, D72 at 14; D73 at 17–18—the Eleventh Circuit explained the Thirteenth Amendment "[s]tanding alone does not forbid the badges and incidents of slavery." 891 F.2d 1555, 1564 (11th Cir. 1990). The court therefore upheld summary judgment in favor of the defendant on a claim that flying a Confederate flag over the Alabama capitol dome violated the Thirteenth Amendment. *Id.* The court observed, "The … sole argument in support of [the] claim that the state has violated the Thirteenth Amendment is that the confederate flag, because of its inspirational power in the confederate army during the Civil War and its adoption by the Ku Klux Klan, is a badge and vestige of slavery." *Id.* (internal quotation marks omitted). The court explained, "Congress has not utilized its Thirteenth Amendment enforcement authority to pass legislation forbidding the flying of the confederate flag as a badge or incident of slavery. Because the flying of the confederate flag is not forbidden by federal statute, summary judgment was properly granted." *Id.*

Mr. Johnson fails to state a § 1983 claim for an alleged violation of the Thirteenth Amendment because, at a minimum, he does not allege the existence of slavery, involuntary servitude, or the equivalent, and Congress has not used its Thirteenth Amendment enforcement authority to prohibit the complained-of actions. *See generally* D63. Like the flying of the Confederate flag over a state capitol dome, an unspecified budgetary enactment allegedly supporting anything named after a Confederate soldier or serving as the site for a Confederate-related monument, flag, or program is insufficient to state a claim for a Thirteenth Amendment violation.

Relying on *United States v. Cannon*, 750 F.3d 492 (5th Cir. 2014), Mr. Johnson contends symbols of white supremacy amount to badges of slavery violative of the Thirteenth Amendment. D76 at 15; D79 at 17.

In *Cannon*, the Fifth Circuit held the Matthew Shepard and James Byrd, Jr. Hate Crimes Prevention Act of 2009, 18 U.S.C. § 249(a)(1), is a valid exercise of congressional power under the Thirteenth Amendment. 750 F.3d at 502. The court explained the Thirteenth Amendment allows Congress to define and regulate the "badges" and "incidents" of slavery if their definition is rational, and the court held the Act survived that review. 750 F.3d at 494.

*Cannon* does not help Mr. Johnson. *Cannon* held Congress could pass a law based on the Thirteenth Amendment; *Cannon* did not hold the Thirteenth Amendment standing alone prohibits badges and incidents of slavery.

Mr. Johnson contends the Governor "completely overlooks" *In re Breland*, 989 F.3d 919 (11th Cir. 2021), in arguing that no private cause of action exists under the Thirteenth Amendment. D79 at 16.

In *Breland*, a real-estate developer filed for Chapter 11 bankruptcy. 989 F.3d at 920. The bankruptcy court determined he was transferring assets and defrauding creditors and therefore removed him as the debtor-in-possession and appointed a trustee to administer the estate. *Id.* He argued the appointment violated his right under the Thirteenth Amendment to freedom from involuntary servitude because, under the trustee's direction, all of his post-petition earnings would be placed in the estate for his creditors. *Id.* The bankruptcy court dismissed the Thirteenth Amendment claim as unripe, and on review the district court held the debtor could not show an injury in fact required for standing. *Id.* at 920–21. On appeal, the Eleventh Circuit disagreed

47

with the standing analysis, holding the debtor's "loss of authority and control over his estate, which he suffered as a result of his removal as the debtor-in-possession, constitutes an Article III-qualifying injury in fact that is both traceable to the bankruptcy court's appointment of the trustee and redressable by an order vacating that appointment—and, accordingly, that [the debtor] has standing to pursue his Thirteenth Amendment claim." *Id.* at 921. The court added:

> It's oh-so tempting to forge ahead and address the merits of [the debtor's] Thirteenth Amendment claim, but our hands are tied. It's true, of course, that we can affirm a district court's judgment based on any ground supported by the record. But when the district court here held that [the debtor] lacked standing to sue, it dismissed his claim for lack of subject-matter jurisdiction—and thus without prejudice. Were we to range beyond the jurisdictional issue here and reject [the debtor]'s claim on the merits, we would, in effect, be directing a dismissal with prejudice—and thereby altering the district court's judgment. That, we cannot do. Accordingly, we reverse the dismissal for lack of standing and remand [the debtor's] case to the district court for a decision on the merits of his Thirteenth Amendment claim.

*Id.* at 922–23 (internal citations and parentheticals omitted).

*Breland* does not help Mr. Johnson. *Breland* held a debtor raising a claim under the Thirteenth Amendment had standing under the circumstances he presented; *Breland* did not address the merits of the debtor's Thirteenth Amendment claim. If anything, *Breland* hurts Mr. Johnson by strongly suggesting the debtor's Thirteenth Amendment claim lacked merit.

Thus, Mr. Johnson fails to state a claim based on an alleged violation of the Thirteenth Amendment.

iii.   _Substantive Due Process_

For count III, Mr. Johnson relies on the substantive component of the Due Process Clause of the Fourteenth Amendment. D63 ¶46. As stated, the clause provides that no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "The touchstone of due process is protection of the individual against arbitrary action of government, whether the fault lies in a denial of fundamental procedural fairness [(procedural due process)] or in the exercise of power without any reasonable justification in the service of a legitimate governmental objective [(substantive due process)]." _Cnty. of Sacramento v. Lewis_, 523 U.S. 833, 845–46 (1998) (cleaned up).

"While due process protection in the substantive sense limits what the government may do in both its legislative and its executive capacities, criteria to identify what is fatally arbitrary differ depending on whether it is legislation or a specific act of a governmental officer that is at issue." _Id._ at 846 (internal citations omitted). In the context of legislation, the substantive component of the Due Process Clause protects state-created, non-fundamental rights against arbitrary and irrational legislative acts. _Lewis v. Brown_, 409 F.3d 1271, 1272–73 (11th Cir. 2005). A challenge to a legislative act that does not implicate fundamental rights is reviewed under the rational-basis standard. _PBT Real Est., LLC v. Town of Palm Beach_, 988 F.3d 1274, 1284 (11th Cir. 2021). "[T]o survive this minimal scrutiny, the challenged provision need only be rationally related to a legitimate government purpose." _Id._ (quoted authority omitted). Fundamental rights are those "rights guaranteed by the first eight Amendments" and "a select list of fundamental rights that are not mentioned anywhere in the Constitution." _Dobbs v. Jackson Women's Health Org._, 142 S.

49

Ct. 2228, 2246 (2022). "In deciding whether a right falls into either of these categories, the [Supreme] Court has long asked whether the right is deeply rooted in our history and tradition and whether it is essential to our Nation's scheme of ordered liberty." *Id.* (cleaned up). In the context of "abusive executive action," the substantive component of the Due Process Clause protects against "egregious official conduct" that "shocks the conscience." *Cnty. of Sacramento*, 523 U.S. at 846.

The Supreme Court has "always been reluctant to expand the concept of substantive due process." *Id.* at 842 (quoted authority omitted). "Where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *Id.* (cleaned up); *see also Echols v. Lawton*, 913 F.3d 1313, 1326 (11th Cir. 2019) ("So when the Framers considered a matter and drafted an amendment to address it, a substantive-due-process analysis is inappropriate. We must analyze the claim under the standard appropriate to that specific provision, not under the rubric of substantive due process." (cleaned up)); *Lindquist v. City of Pasadena*, 525 F.3d 383, 387 (5th Cir. 2008) ("The district court's dismissal of the … substantive due process claims was proper. … As the district court correctly held, this claim is the … equal protection claim recast in substantive due process terms and cannot proceed."); *Eby-Brown Co., LLC v. Wis. Dep't of Agric.*, 295 F.3d 749, 753–54 (7th Cir. 2002), *as amended on denial of reh'g* (Aug. 12, 2002) ("Eby–Brown argues that several provisions of the Act violate both its right to equal protection and its rights to substantive due process. However, many of these arguments are more properly considered claims under the equal protection clause alone.").

Accordingly, "[n]umerous courts have held that where the party's substantive due process claim is based on alleged acts of discrimination, that claim should be analyzed under the framework of the Equal Protection Clause rather than as a substantive due process claim." *McClafferty v. Portage Count Bd. of Elections*, 661 F. Supp. 2d 826, 834 (N.D. Ohio 2009) (alteration in original) (quoted authority omitted) (citing cases); *see also, e.g., Heike v. Guevara*, 519 F. App'x 911, 923 (6th Cir. 2013) ("Heike makes two types of constitutional claims in this case; explicit constitutional guarantees address both. First, she alleges [the defendants] wrongfully declined to renew her scholarship, based either on her race or on her gender. The Equal Protection Clause resolves this claim. Second, she alleges that [the] decision not to renew her scholarship was 'arbitrary and capricious and motivated by bad faith.' … The Equal Protection and Procedural Due Process Clauses resolve this issue. Heike's substantive-due-process claim, therefore, fails.").

Here, Mr. Johnson fails to state a claim based on an alleged violation of his right to substantive due process because the Equal Protection Clause "provides an explicit textual source of constitutional protection against a particular sort of government behavior[.]" *See Cnty. of Sacramento*, 523 U.S. at 842 (quoted). Indeed, Mr. Johnson's substantive-due-process claim is pleaded in substantially the same way as his equal-protection claim, *compare* D63 ¶¶44–53, *with id.* ¶¶54–62, and even Mr. Johnson addresses the claims as one in his responses to the motions to dismiss, *see* D76 at 15–16; D79 at 17–18. The substantive-due-process claim therefore must be analyzed under the Equal Protection Clause, not under "the more generalized notion of substantive due process[.]" *See Cnty. of Sacramento*, 523 U.S. at 842 (quoted).

Even if analyzed under substantive-due-process principles, the claim still fails. In his pleading, Mr. Johnson alleges no facts plausibly showing any specifically identified arbitrary and irrational legislative act or—as the City and the Governor observe, D72 at 15–16; D73 at 18–19—any violation of a fundamental right or egregious official conduct shocking the conscience.

Mr. Johnson contends "the identified fundamental interest is substantive due process to be free of race discrimination in public places, for example - tributes to White supremacy on public land, maintained and preserved by tax-based budgetary legislation, as set forth in Title II Public Accommodation." D76 at 16. Mr. Johnson appears to argue he alleges a violation of a fundamental right, but courts have not recognized as fundamental any right to freedom from any government budgetary enactment in any way supporting a public place named after a Confederate soldier or serving as the site for a Confederate-related monument, flag, or program.

Thus, Mr. Johnson must proceed if at all under the Equal Protection Clause; alternatively, he fails to state a claim based on an alleged violation of his right to substantive due process.

iv.   *Equal Protection Clause*

For count IV, Mr. Johnson relies on § 1983 and the Equal Protection Clause. As stated, the clause provides: "No state shall … deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The clause requires the government to treat similarly situated persons in a similar manner. *Gary v. City of Warner Robins*, 311 F.3d 1334, 1337 (11th Cir. 2002). "If a fundamental right or a suspect class is involved, the court reviews the classification under strict scrutiny." *Id.* "If an ordinance

does not infringe upon a fundamental right or target a protected class, equal protection claims relating to it are judged under the rational basis test; specifically, the ordinance must be rationally related to the achievement of a legitimate government purpose." *Id.* (quoted authority omitted). "When social or economic legislation is at issue, the … Clause allows the States wide latitude, and the Constitution presumes that even improvident decisions will eventually be rectified by the democratic processes." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985) (internal citations omitted).

The Equal Protection Clause does not "require things which are different in fact or opinion to be treated in law as though they were the same." *Tigner v. Texas*, 310 U.S. 141, 147 (1940). "The initial discretion to determine what is 'different' and what is 'the same' resides in the legislatures[.]" *Plyler v. Doe*, 457 U.S. 202, 216 (1982). "A legislature must have substantial latitude to establish classifications that roughly approximate the nature of the problem perceived, that accommodate competing concerns both public and private, and that account for limitations on the practical ability of the State to remedy every ill." *Id.*

"Proof of discriminatory intent or purpose is a necessary prerequisite to any Equal Protection Clause claim[.]" *Corey Airport Servs., Inc. v. Clear Channel Outdoor, Inc.*, 682 F.3d 1293, 1297 (11th Cir. 2012) (brackets and quoted authority omitted). "[T]he idea of intention or purpose means that the decisionmaker selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group." *Id.* (cleaned up).

In *Hunt*, besides rejecting a Thirteenth Amendment claim for flying the Confederate flag over the Alabama capitol dome, the Eleventh Circuit rejected

an Equal Protection Clause claim. 891 F.2d at 1562–63. The court observed, "Certainly the NAACP has a right to equal protection of the laws, in education and otherwise. The Fourteenth Amendment prohibits states from denying to anyone the equal protection of the laws. As the Supreme Court has stated, however, the Amendment requires equal laws, not equal results." *Id.* at 1562 (internal citations omitted). The court ruled, "[T]here is no unequal application of the state policy; all citizens are exposed to the flag. Citizens of all races are offended by its position." *Id.* The court concluded, "There is no legal basis for prohibiting the flying of a confederate flag on government grounds outside the realm of desegregation effort." *Id.*; *see also Moore v. Bryant*, 853 F.3d 245, 250 (5th Cir. 2017) ("[T]he gravamen of an equal protection claim is differential governmental treatment, not differential governmental messaging.").

The City argues Mr. Johnson fails to state claim because he "makes no allegations approaching a claim that the monuments have some sort of unequal impact on him, and thus his Fourteenth Amendment claim fails." D72 at 16. The Governor argues Mr. Johnson fails to state an equal-protection claim because any funding to maintain Confederate-related names, places, or things "offends citizens of all races as in *Hunt* and there is no inequality in the policy of such maintenance." D73 at 21.

The defendants again are correct. At a minimum, as in *Hunt*, Mr. Johnson fails to allege facts showing any unequal application of law or policy; all travelers in the Middle District of Florida are exposed to the names, places, and things about which Mr. Johnson complains.

Mr. Johnson argues he sufficiently pleads a claim based on the Equal Protection Clause through the statement in his pleading that "an intentional governmental endorsement of White supremacy and the ideology that Plaintiff,

a Black American, is inferior and subhuman, violating Plaintiff's 14th Amendment Equal Protection [rights], abridging the central concepts of equality." D76 at 16 (alteration in D76); D79 at 18 (alteration in D79). This statement in his pleading is conclusory and thus insufficient to state a claim.

Thus, Mr. Johnson fails to state a claim based on an alleged violation of the Equal Protection Clause.

v.      *42 U.S.C. § 1981*

For count V, Mr. Johnson relies on 42 U.S.C. § 1981. As stated, the statute provides that all persons within the jurisdiction of the United States "have the same right in every State … to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens."

To state a claim under § 1981, a plaintiff must allege facts making plausible that (1) he is a member of a racial minority, (2) the defendant intended to discriminate against him based on race,[28] and (3) the

---

[28]Section 1981 "can be violated only by purposeful discrimination." *Gen. Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 391 (1982). To state a § 1981 claim, a complaint need not specify facts establishing a prima facie case "but must simply provide enough factual matter to plausibly suggest intentional [race] discrimination." *Evans v. Ga. Reg'l Hosp.*, 850 F.3d 1248, 1253 (11th Cir. 2017), *abrogated on other grounds by Bostock v. Clayton Cnty.*, 140 S. Ct. 1731 (2020); *see also Surtain v. Hamlin Terrace Found.*, 789 F.3d 1239, 1246, 1245 n.6 (11th Cir. 2015) (same). A conclusory allegation that a defendant acted with racial animus is insufficient. *Mondy v. Boulee*, 805 F. App'x 939, 942 (11th Cir. 2020). This Court need not decide whether Mr. Johnson sufficiently alleges facts to show purposeful discrimination because alternative grounds for dismissal exist.

discrimination concerned one or more activities enumerated in § 1981. *Moore v. Grady Mem'l Hosp. Corp.*, 834 F.3d 1168, 1171–72 (11th Cir. 2016).

The only activity arguably pertinent here is making and enforcing contracts.[29] Section 1981(b) provides that "'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." A § 1981 claim proceeding under the "make and enforce contracts" activity "must initially identify an impaired contractual relationship" under which the plaintiff has rights. *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006) (internal quotation marks omitted). The Supreme Court has "never retreated from what should be obvious from reading the text of the statute: Section 1981 offers relief when racial discrimination blocks the creation of a contractual relationship, as well as when racial discrimination impairs an existing contractual relationship, so long as the plaintiff has or would have rights under the existing or proposed contractual relationship." *Id.*

Here, Mr. Johnson fails to state a § 1981 claim for at least one reason argued by the defendants: he fails to allege facts making plausible that the

---

[29]Another activity enumerated in § 1981 is the enjoyment of "the full and equal benefit of all laws and proceedings for the security of persons and property." *See* 42 U.S.C. § 1981(a) (quoted). As courts have observed, few cases arise under the "equal benefit" activity. *See, e.g., Bishop v. Toys "R" Us-NY LLC*, 414 F. Supp. 2d 385, 393 (S.D.N.Y. 2006), *aff'd sub nom. Bishop v. Toys R Us*, 385 F. App'x 38 (2d Cir. 2010). A claim under this activity requires an allegation of racial animus, identification of a "law or proceeding for the security of persons and property," an allegation that the defendant deprived the plaintiff of the full and equal benefit of the law or proceeding, and, in some jurisdictions, state action. *Id.* (quoting 42 U.S.C. § 1981(a)). This activity is inapplicable here because, at a minimum, Mr. Johnson identifies no law or proceeding for the security of persons and property, *see generally* D63, and he does not contend otherwise, *see generally* D76 at 17–18; D79 at 18–19.

alleged discrimination concerned making and enforcing contracts. *See* D72 at 18–19; D73 at 21. In his latest pleading, he identifies no contractual interest at stake.

Mr. Johnson argues, "Section 1981 … does not require a contract between [him] and the City. Rather intentional race discrimination is required as pled. The language of Count V rejects the City's contention: 'an intentional governmental endorsement of White supremacy and the ideology that Plaintiff, a Black American, is inferior and subhuman, violating Plaintiff's 14th Amendment Equal Protection [rights], abridging the central concepts of equality … [the] conduct is intentional.'" D76 at 16 (quoting D63 ¶¶57, 58, 66; some alterations in D76). He makes the same argument in response to the Governor's motion. *See* D79 at 18–19. Mr. Johnson's argument fails. Section 1981 requires more than intentional discrimination; the statute requires one or more activities enumerated in § 1981. Mr. Johnson identifies none.

Thus, Mr. Johnson fails to state a § 1981 claim.

## B.  *Mr. Johnson's Motion for a Speedy Hearing*

In his motion for a speedy hearing, Mr. Johnson contends, "Plaintiff's allegation that approximately 45 tributes to the Confederacy, Confederates, and White supremacists exist on public land and supported by public tax dollars, in at least 16 counties within the Middle District of Florida is not a question of fact and cannot be controverted by discovery. Rather the Court is in a position, and mandated, to rule post-haste on the law of the case—negating the need of a jury trial." D66 at 2–3.

Federal Rule of Civil Procedure 57 provides, "The court may order a speedy hearing of a declaratory-judgment action." This provision "is so sensible and appropriate that there is a dearth of decided cases involving [it]." 10B Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. Civ. § 2768 (4th ed. 2022).

If the Court lacks subject-matter jurisdiction, directing the clerk to terminate the motion for a speedy hearing is warranted. If the Court has subject-matter jurisdiction but Johnson fails to state a claim on which relief can be granted, denying the motion for a speedy hearing as moot is warranted. If the action proceeds, denying the motion for a speedy hearing is warranted because a speedy hearing is unnecessary. No urgency is apparent considering the time it took for Mr. Johnson to sue vis-à-vis the historical roots of the complained-of names, places, and things; the delay he himself caused by filing shotgun pleadings, *see* D1, D59; his amenableness to a July 2023 trial term, D47 at 1; and that he moved for a speedy hearing more than a year after bringing this action, *see* D1 (original complaint filed on July 22, 2021); D66 (motion for speedy hearing filed on October 3, 2022).

## IV.   Recommendation

For these reasons, the undersigned recommends:

(1)   **granting** the motions to dismiss, D72, D73, to the extent the defendants request dismissal for lack of subject-matter jurisdiction;

(2)   **denying** the motions to dismiss, D72, D73, to the extent the defendants request dismissal with prejudice;

(3)   **ruling** the Court lacks subject-matter jurisdiction and **dismissing** the action without prejudice; and

(4)     **directing** the clerk to terminate the motion for a speedy hearing, D66, and close the file.

## V.     Deadlines for Filing Objections and Responses

"Within 14 days after being served with a copy of [a report and recommendation], a party may serve and file specific written objections[.]" Fed. R. Civ. P. 72(b)(2). "A party may respond to another party's objections within 14 days after being served with a copy." *Id.* A party's failure to serve and file specific objections … alters review by the district judge and the United States Court of Appeals for the Eleventh Circuit, including waiver of the right to challenge anything to which no specific objection was made. *See* Fed. R. Civ. P. 72(b)(3); 28 U.S.C. § 636(b)(1)(B); 11th Cir. R. 3-1.

**Entered** in Jacksonville, Florida, on April 4, 2023.

_____
PATRICIA D. BARKSDALE
*United States Magistrate Judge*

c:     The Honorable Marcia Morales Howard

Counsel of record

Earl M. Johnson, Jr.
1635 North Liberty Street, No. 3
Jacksonville, FL 32206
earlmayberryjohnson@gmail.com